**KRAFT FOODS NORTH AMERICA, INC., Plaintiff,**

v.

**BANNER ENGINEERING & SALES, INC., Defendant.**

**No. CIV.A. 305CV248.**

United States District Court, E.D. Virginia, Richmond Division.

Aug. 25, 2006.

James W. Barkley, Esquire, Morin & Barkley, Charlottesville, VA, Kathleen P. Loughhead, Esquire, Mark T. Mullen, Esquire, Cozen O'Connor, Philadelphia, PA, for Plaintiff.

Lynne J. Blane, Esquire, Harmon Claytor Corrigan & Wellman, Richmond, VA, for Defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

In this diversity action, Kraft Foods North America, Inc. ("Kraft") seeks damages from Banner Engineering & Sales, Inc. ("Banner"), asserting claims of negligence, breach of warranty, and breach of contract related to an impedance pipe heating system designed by Banner for Kraft's "Low Trans Oil Project." The case was tried to the Court sitting without a jury. Having reviewed the exhibits and heard the testimony of the witnesses, the Court makes the findings of fact and conclusions of law set forth below.

## FINDINGS OF FACT [1]

### A. Background on Low Trans Oil Project

On July 11, 2003, the Food and Drug Administration ("FDA") issued a final rule requiring that nutrition labels declare the amount of trans fatty acids in conventional foods and dietary supplements, which went into effect on January 1, 2006. *See* 21 C.F.R. § 101.9(c)(2)(ii); 68 Fed.Reg. 41434. Kraft is in the business of manufacturing and distributing food products, including various baked goods. Even before the FDA issued the final rule, Kraft decided that it wanted to be able to declare zero grams of trans fat on its product labels by the time the rule went into effect. To that end, Kraft began to adjust its recipes and to experiment with low trans fat oils. Within Kraft, this was commonly referred to as the "Low Trans Oil Project."

At some point in 2002, Kraft determined that it wanted to move beyond limited plant trials to a full plant trial. Kraft chose its facility in Richmond, Virginia, where it operates a large bakery and warehouse, as one of the first test bakeries. A full plant trial required the installation of a separate oil system that could be isolated from Kraft's regular oil system. This way Kraft could continue its normal production, and then run trials with the low trans fat oils on various product lines for certain periods. To accomplish this separate oil system, Kraft planned to install stainless steel tubing and other equipment at the Richmond facility to transport the low trans fat oils to various parts of the plant.

### B. Contract for Impedance Pipe Heating System

William Kinslow was Kraft's lead engineer for the Low Trans Oil Project, but Kraft also contracted with Foth & Van Dyke Associates Inc. ("Foth & Van Dyke") of Green Bay, Wisconsin as its outside engineering consultants for the Low Trans Oil Project. Foth & Van Dyke was responsible for the process piping engineering on the Low Trans Oil Project, and provided Kraft with both detailed engineering drawings and final installation drawings.

Low trans fat oil has to be maintained at a temperature of approximately 123 degrees Fahrenheit in order to prevent it from solidifying inside the pipes. An impedance heating system accomplishes this task by passing an electric current through the pipes. Banner designs and sells electric impedance pipe heating systems. Foth & Van Dyke contacted Banner of Saginaw, Michigan to solicit a budgetary cost for impedance heating on the piping for the Low Trans Oil Project.

Duane Hammond and Sheryl Pham, Foth & Van Dyke's lead engineers on the

---

1. While most of the findings of fact are recited in this section of the opinion, the Court has included findings of fact in the conclusions of law where appropriate. All findings of fact are made by a preponderance of the evidence.

Low Trans Oil Project, made the initial contact with Banner in September 2002. On September 26, 2002, Pham sent an e-mail to James Glidden at Banner, which described the vertical drops for the 2″ and 2.5″ stainless steel piping in Foth & Van Dyke's design, provided information about the necessary temperature for the low trans fat oils, and attached drawings of the piping. Glidden, a project manager at Banner, prepared a budget quote based on this information and sent it to Foth & Van Dyke on September 30, 2002. Banner quoted Kraft a price of $22,065, which included transformers, control panels, and insulated pipe joints kits for each of the circuits. Insulated (or dielectric) pipe joint kits convert mechanical pipe joints into insulated (or dielectric) pipe joints, which prevent electric current from passing through the joint. Insulated pipe joints are important components of impedance pipe heating systems because they define the boundaries of electrically isolated segments of piping. Banner included a number of materials with its quote, including a two-page letter that detailed the products it would supply, a 2002 rate sheet, terms and conditions, four drawings, and information on Tri–Clamps, Zephyr-weld flanges, and Butt–Weld fittings.

Hammond used the information in Banner's preliminary quote to produce a Design Data Sheet for bidding purposes. Dated December 2, 2002, the Design Data Sheet contained specifications for the impedance pipe heating system for the Low Trans Oil Project. The Design Data Sheet described nearly 1600 linear feet of 2″ and 2.5″ sanitary tubing on four different circuits (Mixer Circuit, Spray Oil Mix Room Circuit, Oven Room Circuit, and Icing Circuit). In a section entitled "Vendor Requirements," the Design Data Sheet specified: "Vendor is to provide with quote recommended installation procedures, insulation, cable/wiring, and spare parts."

Plaintiff's Trial Exhibit 9 (hereinafter "PTX ___"). Kraft and Foth & Van Dyke sent the Design Data Sheet to Banner on December 2, 2002, in an e-mail from Hammond to Glidden. In a follow up e-mail on December 3, 2002, Kinslow instructed Glidden to send Banner's quote by e-mail as an attached Word document.

The Design Data Sheet sent to Banner included several attachments, which was contemplated in the text of the Design Data Sheet. The December 2nd e-mail from Hammond to Glidden suggests that most of the attachments contemplated in the Design Data Sheet were in fact sent to Banner. The names of the attached files indicate that Banner received "Attachment D," which related to "Tagging, Shipping, and Quality Assurance Requirements," as well as "Attachment E," which related to "Data Submittal Requirements." Banner also received three drawings prepared by Foth & Van Dyke: 02K075–1.dwg, 02K075–2A.dwg, and 02K075–2B.dwg. *See* Defendant's Trial Exhibit 5 (hereinafter "DTX ___"). However, Hammond's e-mail does not indicate that Banner received "Attachment C," which the Design Data Sheet indicated would be included. Attachment C was supposed to be "Terms and Conditions—Per KFNA Purchasing P.O."

On December 9, 2002, Banner sent Kraft a two-page quote for the impedance pipe heating system, based on the specifications in the Design Data Sheet. Banner's bid set forth the material and equipment to be supplied by Banner for a price of $25,277, and attached a 2002 rate sheet, terms and conditions, six drawings, and it recommended the use of Tri–Clamps, Zephyr-weld flanges, and Butt–Weld fittings. At Foth & Van Dyke's request, Banner submitted a revised bid on December 16,

2002 [2] that upgraded some of the electrical components, for a price of $26,397. The change in price was based on Nema 4 transformer cases for the Mixer Circuit and the Spray Oil Mix Room Circuit, which upgraded the transformers to the same protection level as the corresponding control panels. Otherwise, the revised quote was identical to the December 9th quote, and included all the same attachments. Kraft received Banner's quote in an e-mail from Hammond to Kinslow and Kevin Masterson on December 16, 2002.

The "Terms and Conditions of Sale" attached to Banner's quote stated in pertinent part:

3. All orders are subject to acceptance by the SELLER at its home office in Saginaw, Michigan USA. The liability of the SELLER is limited to the proposal and terms and conditions herein.

 \* \* \* \* \* \*

10. All goods sold are warranted or guaranteed only to the extent of the express warranty of the MANUFACTURER. In no event shall the SELLER be liable for consequential damages.

PTX 10.

Banner's quote included a total of 35 insulated pipe joint kits for the four circuits. Each insulated pipe joint kit would consist of one white nitrile full face dielectric gasket, one white nitrile ring type dielectric gasket, four bolt insulators, four stainless steel SAE washers, and four stainless steel bolts and nuts. Among the six drawings submitted with the quote,

Banner included Banner Drawing No. 92–0602–1(P), which shows an exploded view of how an insulated pipe joint should be assembled.[3] Dated June 2, 1992, Banner Drawing No. 92–0602–1(P) was not prepared specifically for Kraft's Low Trans Oil Project. Indeed, the drawing was not an engineered drawing for a specific application, but rather was a "design drawing" or "cut sheet," which was intended to give a general indication as to how an insulated pipe joint kit is integrated into a mechanical pipe joint to upgrade it to a dielectric pipe joint. In fact, the cut sheet contained information for tubes of several diameters, but not for the 2.5″ tubing which comprised a substantial portion of the stainless steel tubing used in the Low Trans Oil Project.

The cut sheet included two notations. Next to a line leading to a depiction of a bolt insulator, the cut sheet stated: "BUSHING LENGTH: CUT TO SUIT." PTX 10. The term "bushing" refers to the bolt insulator. The bolt insulator did not come precut and had to be trimmed in the field in relation to the thickness of the flange. Then, next to a line leading to a depiction of a stainless steel hex nut, the cut sheet stated: "NOTE: MAXIMUM TORQUE 60 FT. LBS." *Id.* This second notation is at the heart of Kraft's claim for breach of contract.

On December 17, 2002, Phillip Brown of Kraft sent a purchase order for $26,397 to Banner's Jim Glidden, by facsimile. In the body of the purchase order, Kraft stated: "This Purchase Order is per the attached proposal dated 12/9/02." PTX 26. The

---

**2.** Banner's revised quote is dated December 9, 2002, but Kinslow testified that this was a typographical error, and an e-mail from Patrick Morris, a Banner project engineer, to Hammond confirms that the revised quote was sent to Foth & Van Dyke and Kraft on December 16, 2002. *See* PTX 11.

**3.** This same drawing was included in both Banner's preliminary quote and the December 9th quote.

purchase order then recited verbatim the text from Banner's quote with respect to the materials Banner had offered to supply for the impedance pipe heating system: the electrical components for the four circuits and the insulated pipe joint kits. The copy of the purchase order sent by facsimile did not include the technical drawing submitted by Banner with its proposal. The evidence at trial did not conclusively establish whether Kraft sent Banner a physical or electronic copy of the purchase order with the drawings attached. Kinslow testified that he intended that the drawings would be attached to the purchase order and considered the drawings to be part of the contract. However, Kinslow did not personally send out the purchase order. Joseph Day, the President of Banner, testified that Banner did not receive any drawings with Kraft's purchase order.

At the beginning of the purchase order, Kraft stated: "Kraft's terms and conditions shall supercede all other terms and conditions whether expressed or implied." PTX 26. After reciting the language in Banner's quote and the amount of the purchase order, Kraft included the following:

> WARRANTY: Seller warrants the goods to be free from defects in materials and workmanship, and guarantees to repair and/or replace, at Seller's expense, any part thereof which is found by Buyer to be defective within a period of one year from date of Installation.
> PERFORMANCE GUARANTEE:
> Equipment not manufactured by Seller shall be covered by the guarantee of its manufacturer.
> Seller guarantees the goods to perform in accordance with performance specifications in this Purchase Order and to make the goods covered by this Purchase Order fulfill said guarantee or to

remove same at its expense and refund all payments made therefor by Buyer. *Id.*

Attached to Kraft's purchase order was a separate set of "terms and conditions," which stated in pertinent part:

> ACCEPTANCE The first to occur of Seller's acceptance of this Order or shipment of goods pursuant to this Order, shall constitute Seller's agreement to the terms and conditions set forth on the face and back of this Purchase Order. No other terms, whether or not contained in any bid, estimate, acknowledgment, confirmation or invoice given by Seller, shall in any way modify or supersede any of the terms of this Order or otherwise be binding on Buyer, and Buyer hereby explicitly rejects all such other terms unless it has accepted such other terms by a written instrument signed by its authorized representative.
> QUALITY Seller warrants that all goods will (a) conform to specifications furnished by Seller and approved by Buyer, ... Seller warrants that all goods have been tested for their safety, will be of merchantable quality and of good material and workmanship, free from defect, suitable for their intended use in or with food products....
> REJECTION Payment for goods delivered hereunder shall not constitute acceptance thereof.... Buyer, at its option, may require replacement of defective or rejected goods or a refund of the purchase price, as well as payment of damages...
>
> \* \* \* \* \* \*
>
> INDEMNIFICATION; INSURANCE Seller shall defend, indemnify and hold Buyer harmless against all damages, claims, liabilities and/or expenses (including attorney's fees) arising out of or resulting in any way from any defect in

the goods purchased hereunder, from any act or omission of Seller, its employees, agents or subcontractors, or from Seller's breach of any warranty as provided herein or otherwise provided by law....

PTX 26.

Banner supplied the materials and equipment pursuant to the purchase order dated December 17, 2002, and was paid in full by Kraft therefor.

### C. Installation of Insulated Pipe Joints

On January 6, 2003, FloOnics, LLC ("FloOnics") of Richmond, Virginia submitted a bid of $224,375 for the contract to install the process piping for the Low Trans Oil Project. FloOnics was the successful bidder, and Kraft issued a purchase order to FloOnics in the amount of its bid. The installation that FloOnics contracted to perform included assemblage of the insulated pipe joints, using the insulated pipe joint kits provided by Banner. Each of Banner's kits included one white nitrile dielectric ring gasket, one white nitrile dielectric full face gasket, four bolt insulators, four stainless steel SAE washers, and four stainless steel hex nuts and bolts. FloOnics provided the Tri–Clover 14 VA nipples and the Tri–Clover 38 SL flanges,[4] which completed the necessary parts for each insulated pipe joint.

FloOnics installed the piping for the Low Trans Oil Project at Kraft's Richmond facility over the course of approximately eight to ten weeks in early 2003.

Kraft contracted for the services of Wilson Hunter, an outside project engineer, to oversee the installation. Banner's cut sheet was provided to FloOnics as part of the installation drawings for the process piping, and FloOnics used the cut sheet to assemble the insulated pipe joints. The project manager for FloOnics, Larri Hand, understood the "cut bushings to suit" notation to mean that the bolt insulators were precut to suit the application, and was not aware that any of the bolt insulators were trimmed as part of the installation.[5] FloOnics used torque wrenches to tighten the stainless steel bolts to 60 foot-pounds, as it understood Banner's cut sheet to require.

### D. Failure of White Nitrile Gaskets

On March 28, 2003, Kraft began to run two week trials with the low trans fat oils on several product lines, starting with Oreo cookies. Kraft then moved to Ritz crackers on April 14, 2003, to Chunky Chips Ahoy! cookies on April 29, and to Chips Ahoy! cookies on May 14, 2003. During the first shift on May 14, 2003, when Kraft was conducting a low trans fat oil trial on Chips Ahoy! cookies, an operator found a Chips Ahoy! cookie baked inside an unidentified white rubber ring. Alarmed by the foreign substance contamination and the potential choking hazard, Kraft personnel began to investigate the origin of the white rubber ring. In fact, it is protocol at Kraft to conduct an investigation anytime foreign material is discovered in its food products. As Kraft began the investigation, the Quality Services

---

**4.** Because of supply problems FloOnics used approximately 20 percent Tri–Clover 14 VB lap joint stub ends in place of the 14 VA flared nipples, in assembling the insulated pipe joints. These two types of nipples were interchangeable insofar as they were both compatible with the insulated pipe joint kit designed by Banner.

**5.** David Toler, an expert in mechanical engineering and failure analysis, examined the preserved insulated pipe joint parts in preparation for this litigation, and determined that a number of the bolt insulators were properly trimmed. However, some of the bolt insulators had not been trimmed and came into contact with the flange.

Manager at the plant, Dennis Elphick, put a hold on production on the Chips Ahoy! cookie line.[6]

Kraft personnel suspected the gaskets in the low trans fat oil piping because of their recent installation and because of the shape, texture, and color of the white rubber ring. Additionally, the Mechanical Supervisor in the Processing Department, Doug Edwards, reported to Elphick that the white rubber ring was similar in color and texture to a small piece of white rubber found in the Ritz cracker dough on April 17, 2003. The common denominator between the two instances was that Kraft was conducting a low trans fat oil trial on the Ritz cracker line on April 17, 2003.[7] Kraft then pulled down a section of pipe between two 90–degree bends, having identified it as the most likely location for gasket material to become lodged. And, indeed, Kraft found gasket material lodged in the 90–degree bends of the low trans oil piping, and confirmed its suspicions that the white ring material was a piece of white nitrile gasket.

After the incident on May 14, 2003, Kraft disassembled the low trans fat oil piping at the flanges. Kraft preserved the flanges and gaskets, photographing them and tagging each with respect to its location in the plant. Twenty-nine of the 34 gasket sets (ring gasket and full face gasket) removed were damaged, though the severity of the damage varied.

The expert testimony of David Toler established that the white nitrile gaskets tore as a result of too much torque on the bolts in the assembled insulated pipe joint. The first step in the required engineering analysis is to convert the specified torque into a clamping load. This is done by employing a formula that considers a number of variables: the stressed diameter of the bolt, the coefficient of friction, and the applied torque. At 60 foot-pounds of torque, each bolt produced a clamping force of 5,750 pounds of clamping force. With four bolts per insulated pipe joint, the combined load was 23,000 pounds of clamping force.

The next step in the engineering analysis is to determine the amount of area of the gasket over which the clamping load would be exerted. With the 14 VA flared nipples, the area of the gasket over which the clamping load was exerted was three square inches. The compressive stress on the gasket is calculated by dividing the total clamping load by the area of the gasket over which it was distributed. In this case, 23,000 pounds of clamping force divided by three square inches produces a compressive stress figure of approximately 7,700 pounds per square inch. With the 14 VB lap joint stub ends, the area was seven and a half square inches,[8] and the compressive stress figure was approximately 3,000 pounds per square inch.

It is difficult to calculate the compressive strength of elastomers like nitrile because they are subject to deformation as

**6.** After determining that all lines connected to the low trans oil piping were free from gasket material, Kraft resumed production without low trans fat oil and did so in short order.

**7.** Edwards testified that he conducted an investigation at the time of the April 17th incident, but was unable to identify the origin of the material. At the time, he did not suspect the gaskets in the low trans oil piping and did not investigate that possibility. However, the

discovery of the material was not reported to the plant's quality control personnel, which was contrary to Kraft protocol.

**8.** The 14 VB lap joint stub end has a greater surface area than the 14 VA flared nipple because of the different manufacturing processes. Where the VB nipple is flat and welded onto a straight tube, the VA nipple is formed by rolling the edge of a tube.

compressive force is applied. Depending on how quickly the compressive force is applied, tests of compressive strength will produce different figures. Consequently, for elastomers, it is common practice to examine tensile strength, which can be more easily determined in accordance with the specified methodology of the American Society for Testing and Materials. While the tensile strength of white nitrile is not exactly the same as its compressive strength, the two are related and are of the same order of magnitude. The tensile strength of white nitrile is approximately 1,200 pounds per square inch. Thus, the compressive strength of white nitrile is close to 1,200 pounds per square inch.

When 60 foot-pounds of torque was applied to the bolts of the insulated pipe joints, it created a compressive stress greater than the compressive strength of the white nitrile gaskets. As a result, the gasket material began to "creep" as the clamping force was applied. In other words, the white nitrile gaskets extruded from between the two nipples as the flanges were clamped together. Part of the gasket flowed into the pipe itself.[9] The flow of the gasket also caused some deformation of the bolt holes as the gasket material pressed up against the bolts and untrimmed bolt insulators.

The part of the gasket that was in contact with the nipple (or stub end) was held in place by friction. Meanwhile, the middle of the gasket was flowing toward the center of the pipe. This created a relative motion between the middle of the gasket and the side of the gasket in contact with the nipple. The resulting tensile stress on the white nitrile caused numerous tears in the gaskets, which were perpendicular to the direction in which the gasket was be-

ing stretched. As the white nitrile extruded into the pipe, the gaskets tore in a quasi-circumferential direction around the inside of the contact face of the nipples.

Of the gaskets removed from the low trans fat oil piping, 22 were torn 360 degrees around the inside of the contact face of the nipples. However, the tears were not of uniform severity, nor were they continuous in all cases, which would have resulted in separation. Three gaskets were only torn 180 degrees around the circumference. That tearing was the result of too much torque, just as with the other gaskets, but the difference in tearing was the result of a nonuniform clamping load over the area of the gasket in contact with the nipples. Conceptually, the nonuniform load could have been the result of uneven torque at the time of installation, a failure to trim the bolt insulators, or a combination of both. However, the gaskets failed even if the bolt insulators were properly trimmed. Thus, the torque applied to the bolts created too great a clamping load whether it was evenly exerted or not.

Given the components of the insulated pipe joint designed by Banner, the bolts could have been torqued to approximately 20 foot pounds without causing tears in the white nitrile gaskets. This torque figure would still have provided sufficient clamping force to create a proper seal. The gaskets would not have failed at 20 foot-pounds, though there may still have been some deformation of the gaskets.

The components of the insulated pipe joint also could have been altered to account for these mechanical forces. For example, a gasket material with a higher durometer, which is a measure of hardness

---

9. Additionally, the inside diameter of the gaskets was not cut big enough. Thus, even before the clamping force was applied, the inside edge of the gasket was already protruding into the pipe.

or resistance to indentation, could have been used. A gasket material with a higher durometer than white nitrile would have been more resistant to compressive loading. Another alternative would have been to use 14 VB lap joint stub ends, as opposed to the 14 VA flared nipples. The greater surface area of the VB nipples would have reduced the compressive stress on the gasket by a factor of more than two.[10] A torque value of 60 foot-pounds still would not have been appropriate with these components, but they would allow a higher torque value with less deformation of the gaskets.

After FloOnics finished installing the piping for the Low Trans Oil Project, it subcontracted with Chemical Cleaning Specialists to clean the piping. However, the testimony of Dr. Ronald Kander, an expert on the chemical composition and mechanical properties of elastomers, established that the failure of the gaskets was not the result of chemical attack. Dr. Kander conducted a differential scanning calorimetry experiment and a thermogravimetric analysis on samples from one of the gaskets. One sample was from the inner edge of the inner section of the gasket, which was exposed to the internal temperatures of the pipe as well as the cleaning fluids (a trisodium phosphate and water solution as well as a citric acid and water solution) and low trans fat oil that were run through the piping. The second sample was from the inner edge of the middle section, and the third samples was from the outer edge of the gasket. There

were no statistically significant differences in the outcomes of the experiments, indicating that there was no measurable chemical or thermal degradation of the gasket material.

### E. Aftermath of May 14, 2003 Incident

Following the discovery of the Chips Ahoy! cookie baked inside the piece of white nitrile gasket and the damage to the other gaskets, Kraft had concerns about the safety of the cookies. While the low trans fat oil trial on the Chips Ahoy! line had just begun the morning of the incident, Kraft had conducted a low trans fat oil trial on the Chunky Chips Ahoy! line for the two week period starting April 29, 2003. Kraft was concerned about the possibility of foreign substance contamination and choking hazards in the Chunky Chips Ahoy! cookies produced during that period.[11]

On May 21, 2003, Kraft's Division Quality Manager, Jonathan Fischer, directed employees at the Richmond plant to conduct a random sample of the Chunk Chips Ahoy! cookies produced during the low trans fat oil trial. Fischer directed that Kraft personnel sample seven cases per layer on each pallet of product. Each pallet has seven layers and each case has two bags of cookies, so the sample was supposed to involve 98 bags per pallet.

In order to determine whether the cookies contained any pieces of white nitrile gasket material, the cookies had to be

---

**10.** In fact, of the gaskets removed from the low trans fat oil piping, the only gaskets that did not show any tearing or deep imprints were from insulated pipe joints assembled with two VB nipples.

**11.** Kraft was not concerned about the safety of the Oreo cookies and Ritz crackers produced during the low trans fat oil trials because the low trans fat oil was used primarily

as a spray-on coating. There is a strainer on the end of the piping where the oil is sprayed onto the product. Kraft was satisfied that the strainers would have prevented gasket material from reaching the Oreo cookie and Ritz cracker products. Consequently, those products were deemed safe for distribution and were released for sale.

physically crumbled up and destroyed. Employees at the Richmond facility were instructed to complete the sampling in approximately one day. Kraft set up tables in its production area and assigned approximately 40 to 50 employees, a mix of salaried employees and operators, to sample the cookies. In the end, Kraft sampled 57 pallets and destroyed 466 cases (932 bags) of Chunky Chips Ahoy! cookies in the process.[12]

While Kraft did not find any white nitrile material in the sampled cookies, it remained concerned about the possibility of foreign substance contamination and choking hazards in its products. Additionally, it appeared that there were missing pieces from the damaged gaskets, for which Kraft had not accounted in its sampling. Ultimately, Kraft determined that a satisfactory inspection of the product would exceed the cost of the product. Consequently, Kraft decided to destroy all of the Chunky Chips Ahoy! and Chips Ahoy! cookies produced during the low trans oil trials at the Richmond plant. However, Kraft presented no evidence as to the economics of this decision beyond the bare conclusion.

All told, Kraft destroyed nearly 35,000 cases of cookies. Including the 466 cases destroyed during sampling, Kraft destroyed 28,500 cases of Chunky Chips Ahoy! cookies. Kraft destroyed 6,391 cases of Chips Ahoy! cookies. In 2003, the national standard budgeted cost for a case of Chunky Chips Ahoy! cookies was $11.25, and for a case of Chips Ahoy! cookies it was $10.32. That national standard budgeted cost is the manufacturing cost, including raw materials and labor. Kraft revises the national standard budgeted cost once a year when it produces its annual budget. The cost is not revised based on minor fluctuations in the cost of raw materials or labor. However, for a significant change in cost, the national standard for manufacturing cost would be revised.

Kraft informed Banner of its decision to destroy the potentially contaminated product by letter dated June 10, 2003. Kraft advised that it intended to mitigate its losses by selling the destroyed food product for use as animal feed. After giving Banner time to inspect the product, Kraft destroyed the cookies over the course of several months, July 2003 to October 2003. Many of the cases of Chunky Chips Ahoy! cookies already had been distributed to various Kraft facilities around the country, and were destroyed at those locations. Kraft alleges that it incurred costs of $5,725.85 related to the destruction of product at various facilities around the country. At the Buena Park facility in Modesto, California, Kraft says that it incurred a charge of $1,405.08 to destroy food product, but no independent proof of that was offered. The product from the Richmond facility was sent to a company called Bakery Feeds, located in Doswell, Virginia. Kraft incurred no charge for the finished product sent to Bakery Feeds, but neither did it sell the product to Bakery Feeds in mitigation of its losses.

Kraft incurred $5,407.02 in charges related to storage of product at the Buena Park facility in June and July 2003, as well as $350.00 in related labor. At the Richmond facility, Kraft says that it paid $813.70 and $520.00 to rent trailers to store finished product in July 2003, but there is no support for the $520.00 figure.

Low trans fat oil has a shelf-life of approximately 30 days. The Low Trans Oil Project was shut down for approximately four to five months after the May 14, 2003 incident. Consequently, the low trans fat oil that was in use at the Richmond plant

---

12. Obviously, 932 bags sampled from 57 pallets does not work out to 98 bags per pallet.

on May 14, 2003 went rancid before Kraft could use it, and Kraft had to dispose of it. The cost of the low trans fat oil that Kraft disposed of was $49,539. Kraft also says that it incurred demurrage charges of $3200.00 because it had to hold onto a railroad car with raw ingredients for low trans fat oil that could not be unloaded. There was no proof of the demurrage charge, just an estimate.

Kraft also incurred additional labor costs as a result of the failure of the white nitrile gaskets. Kraft devoted 565 hours to cleaning its food oil piping on May 17 and 18, 2003, all of which was paid at overtime rates. With respect to the sampling conducted on May 21 and 22, 2003, Kraft employees worked 667 hours. Of those 667 hours, 520 hours were paid at the normal hourly rate and 147 hours were paid at the overtime rate. At Kraft, the normal hourly wage rate is $20.25, the overtime wage rate is $33.41, and the fringe benefit rate is $15.14. The total labor cost of hourly employees related to the sampling and cleanup amounted to $59,963.28. Kraft also paid $11,003.84 in overtime charges to salaried employees, and paid $364.33 to temporary employees who helped with the sampling.

Kraft incurred $1,668.54 in traveling and entertainment expenses for two employees from its corporate headquarters, who traveled to the Richmond plant to work on the problem with the gaskets. However, Kraft never explained the nature of the trip or the work, and did not provide an itemized account of the travel and entertainment expenses.

Finally, Kraft incurred charges of $385.00 to clean tables and chairs that were used to conduct the sampling.

### F. Parties' Understanding of Contract

The basic dispute in this case is whether the contract between Banner and Kraft included an express warranty with respect to the appropriate level of torque to be applied to the insulated pipe joint for the Low Trans Oil Project. At the heart of that dispute is the meaning of Banner's cut sheet and the notation: "MAXIMUM TORQUE 60 FT. LBS." that appears thereon.

When Kinslow accepted Banner's bid to provide the impedance pipe heating system for the Low Trans Oil Project, he believed that Banner had mechanically engineered the insulated pipe joints. He assumed Banner had done the necessary calculations because Banner had included the cut sheet with its proposal, and the cut sheet specified a maximum torque value for the bolts in the insulated pipe joints. If Kinslow had known that Banner's quote did not include mechanical engineering of the insulated pipe joint, he would have insisted that Banner include it, or else he would have sought out another vendor. Kraft wanted single source responsibility for the impedance pipe heating system, which it believed included the mechanical engineering of the insulated pipe joint. While Foth & Van Dyke was responsible for the overall process piping engineering, Kraft believed that the mechanical engineering of the insulated pipe joints was Banner's responsibility.

Banner, on the other hand, did not understand its proposal or Kraft's purchase order to include mechanical engineering of the insulated pipe joint. Banner has never provided specific design engineering of insulated pipe joints for its customers because such engineering is beyond its field of expertise. Rather, the scope of Banner's expertise relates to the electrical aspects of impedance heating systems, including how to transform a mechanical pipe joint into a dielectric pipe joint.

Banner included the cut sheet to demonstrate how an insulated pipe joint kit is incorporated into a mechanical pipe joint, thereby upgrading it to a dielectric pipe joint. The cut sheet was not prepared specifically for Kraft's Low Trans Oil Project. Glidden, who created the 1992 cut sheet, obtained the maximum torque specification from an American National Standards Institute (ANSI) publication based on the size of the bolt and flange. Day testified that Banner's purpose in including this notation was to avoid exposing the bolt to too much torque, such that it was deformed on a permanent basis. However, in Glidden's deposition, he said the purpose of the notation was to ensure the flange was not under-tightened and that the notation tells the installer how much torque to use.

Banner performed no bolt load calculations prior to creating the cut sheet or prior to submitting its proposal to Kraft. Nor did Banner consider the durometer of white nitrile gaskets or their compressive strength.

## CONCLUSIONS OF LAW

The Court has jurisdiction over this diversity action pursuant to 28 U.S.C. § 1332. "In an action based upon diversity of citizenship, the relevant state law controls. The district court must apply the law of the forum state, including its choice of law rules." *Limbach Co. LLC v. Zurich American Ins. Co.*, 396 F.3d 358, 361 (4th Cir.2005)(citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–497, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)).

"[W]here parties to a contract have expressly declared that the agreement shall be construed as made with reference to the law of a particular jurisdiction," the Supreme Court of Virginia has directed

that such declarations will be enforced. *Paul Business Systems, Inc. v. Canon U.S.A., Inc.*, 240 Va. 337, 397 S.E.2d 804, 807 (1990). While the contract in this case contained a choice of law provision, designating Illinois law, neither party has sought to enforce it. Rather, Kraft and Banner agree that Virginia law applies to Kraft's breach of contract claim (Count III).

■ Under Virginia's choice of law rules, "[q]uestions concerning the validity, effect, and interpretation of a contract are resolved according to the law of the state where the contract was made." *Seabulk Offshore, Ltd. v. American Home Assur. Co.*, 377 F.3d 408, 419 (4th Cir.2004). "[A] contract is made when the last act to complete it is performed." *Id.* In this case, Kraft's purchase order directed that Banner could accept its offer either by express acceptance of the purchase order or by shipment of the goods pursuant to the purchase order. The purchase order directed that all shipments should be made F.O.B. destination. Consequently, Banner accepted the contract when it delivered the goods, whether conforming or nonconforming, to the Richmond plant. *See* Va.Code § 8.2–206. Thus, the contract was made in Virginia and Virginia's substantive law applies to Count III.

■ With respect to Kraft's negligence claim, the Court should "adhere to the *lex loci delicti*, or place of the wrong, standard that [is] 'the settled rule in Virginia.'" *Jones v. R.S. Jones and Associates, Inc.*, 246 Va. 3, 431 S.E.2d 33, 34 (1993). "The place of the wrong for purposes of the *lex loci delicti* rule [ ] is defined as the place where 'the last event necessary to make an act liable for an alleged tort takes place.'" *Quillen v. Int'l Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir.1986) (quoting *Miller v. Holiday Inns, Inc.*, 436 F.Supp.

460, 462 (E.D.Va.1977)). "The word 'tort' has a settled meaning in Virginia. A tort is any civil wrong or injury; a wrongful act. Thus Virginia's choice of law rule selects the law of the state in which the wrongful act took place, wherever the effects of that act are felt." *Milton v. IIT Research Institute,* 138 F.3d 519, 522 (4th Cir.1998) (omitting internal citations and quotation marks).

■ The allegedly wrongful act in this case was Banner's delivery of a negligently designed impedance pipe heating system. The delivery was to Kraft's Richmond facility, and thus Virginia tort law applies to Count I.

## I. Negligence Claim

In Count I, Kraft asserts that Banner "had a duty to Kraft Foods to design an impedance heating system that met the standards and specifications detailed by Kraft Foods in the Low Trans Oil Project documents." Amended Complaint ¶ 22. According to Kraft, Banner allegedly breached that duty "by designing a system that incorporated defective gaskets, unfit for their intended purpose, causing Kraft Foods to lose production, destroy finished product, incur extra expenses and suffer other losses directly related to the defective system." *Id.* ¶ 23.

■ "A tort action cannot be based solely on a negligent breach of contract." *Richmond Metropolitan Authority v. McDevitt Street Bovis, Inc.,* 256 Va. 553, 507 S.E.2d 344, 347 (1998). While there are circumstances under which a plaintiff can demonstrate both a breach of contract and a tortious breach of duty, "the duty tortiously or negligently breached must be a common law duty, not one existing between the parties solely by virtue of the contract." *Foreign Mission Bd. of Southern Baptist Convention v. Wade,* 242 Va.

234, 409 S.E.2d 144, 148 (1991). As the Supreme Court of Virginia has noted

> If the cause of complaint be for an act of omission or non-feasance which, without proof of a contract to do what was left undone, would not give rise to any cause of action (because no duty apart from contract to do what is complained of exists) then the action is founded upon contract, and not upon tort. If, on the other hand, the relation of the plaintiff and the defendants be such that a duty arises from that relationship, irrespective of contract, to take due care, and the defendants are negligent, then the action is one of tort.

*Oleyar v. Kerr,* 217 Va. 88, 225 S.E.2d 398, 399–400 (1976)(quoting Burks Pleading and Practice § 234 at 406 (4th ed.1952)). "The law of torts provides redress only for the violation of certain common law and statutory duties involving the safety of persons and property, which are imposed to protect the broad interests of society." *Filak v. George,* 267 Va. 612, 594 S.E.2d 610, 613 (2004). *See also Size, Inc. v. Network Solutions, Inc.,* 255 F.Supp.2d 568, 574 (E.D.Va.2003); *Commerce Funding Corp. v. Southern Financial Bank,* 80 F.Supp.2d 582, 586 (E.D.Va.1999).

■ Count I alleges negligent performance of a contract, for which there is no cause of action under Virginia law. Banner's duty to design an impedance pipe heating system for the Low Trans Oil Project that met certain standards and specifications arose solely out of contract. Kraft has pointed to no common law duty, irrespective of contract, that would require Banner to design an impedance pipe heating system in accordance with certain standards and specifications. Any disappointment with respect to the quality of the impedance pipe heating system designed by Banner should be addressed

through contractual remedies.[13] The case upon which Kraft principally relies, *Factory Mutual Ins. Co. v. DLR Contracting, Inc.*, 2005 WL 2704502 (E.D.Va.2005), is inapposite.

## II. Breach of Contract Claim [14]

 In Count III, Kraft asserts a claim against Banner for breach of express and implied contractual obligations. "The essential elements of a claim for breach of contract are: (1) a legal obligation of a defendant to the plaintiff, (2) a violation or breach of that right or duty, and (3) a consequential injury or damage to the plaintiff." *Westminster Investing Corp. v. Lamps Unlimited, Inc.*, 237 Va. 543, 379 S.E.2d 316, 317 (1989)(quoting *Caudill v. Wise Rambler*, 210 Va. 11, 13, 168 S.E.2d 257, 259 (1969))(omitting internal quotation marks).

### A. Contract Formation

There is no dispute that the parties contracted for Banner to provide an impedance pipe heating system to Kraft for the Low Trans Oil Project. However, there is a considerable dispute with respect to which party's terms and conditions are included in the contract. Banner argues that the terms and conditions submitted with its proposal on December 16, 2002 are controlling, whereas Kraft maintains that the terms and conditions contained in the December 17, 2002 purchase order are controlling. The disagreement centers around whether Kraft's purchase order op-

erated as an acceptance or rather as a rejection and counteroffer.

Thus, the first issue to be resolved is a slight variation of the classic "battle of the forms" scenario which arises when a seller accepts an offer made by a buyer in a purchase order by sending an "acknowledgment," which contains terms and conditions different than those contained in the purchase order. Here, Banner asserts that its price quotation was the offer and that Kraft's purchase order operated as an acceptance. Given that this transaction involved the sale of goods, issues of contract formation are governed by the Uniform Commercial Code (UCC) as adopted by statute in Virginia. *See Wells, Waters & Gases, Inc. v. Air Products & Chemicals, Inc.*, 19 F.3d 157 (4th Cir.1994).

 "Price quotations are a daily part of commerce by which products are shopped and commercial transactions initiated. Without more, they amount to an invitation to enter into negotiations, but generally they are not offers that can be accepted to form binding contracts." *Audio Visual Associates, Inc. v. Sharp Electronics Corp.*, 210 F.3d 254, 259 (4th Cir. 2000). *See also Dyno Constr. Co. v. McWane, Inc.*, 198 F.3d 567, 572 (6th Cir. 1999) (noting that a price quotation is usually considered an invitation for an offer); *Interstate Indus., Inc. v. Barclay Indus., Inc.*, 540 F.2d 868, 870–73 (7th Cir.1976) (discussing distinctions between a price quotation and an offer); *Harper Hardware Co. v. Powers Fasteners, Inc.*, 2006 WL 141672, *2 (E.D.Va.2006) (unpublished)

---

**13.** While there is some case law that discusses a duty of care that engineers owe when designing plans and specifications, Kraft has not pleaded or proved the existence or breach of any such duty of care in this case. Neither has Kraft asserted a products liability tort action based on a theory of design defect in the insulated pipe joint kits or defective instructions.

**14.** Kraft is no longer pursuing Count II, which asserted a claim for breach of an implied warranty that Banner's services would be of good and workmanlike character. Kraft abandoned Count II at trial and an order dismissing it under Fed. Civ. P. 41 will be entered.

(citing *Audio Visual Associates* and applying Virginia law). "[T]he offer usually takes the form of a purchase order, providing product choice, quantity, price, and terms of delivery." *Audio Visual Associates*, 210 F.3d at 259.

■ Consequently, "[a]s a general rule, the submission of a purchase order by a prospective buyer is viewed as an offer which may then be accepted or rejected by a seller." *J.B. Moore Elec. Contractor, Inc. v. Westinghouse Elec. Supply Co.*, 221 Va. 745, 273 S.E.2d 553, 556 (1981). "However, the determination whether an offer inviting acceptance has been made is controlled by the expressed intention of the offeror." *Id.* (citing Corbin on Contracts, § 11, at 25 (1963); Va.Code § 8.2–2–4). In *Moore*, the Supreme Court of Virginia found that a purchase order prepared and submitted by a seller, and intended to be an offer, ripened into a contract upon acceptance by the buyer. *See id.* at 556–557. *See also Servco Equipment Co. v. C.M. Lingle Co.*, 487 S.W.2d 869, 870 (Mo.Ct.App.1972) (holding that buyer's purchase order constituted acceptance where it incorporated terms and conditions "as per your quotation," upon which the Supreme Court of Virginia relied in deciding *Moore* ); *Earl M. Jorgensen Co. v. Mark Const., Inc.*, 56 Haw. 466, 540 P.2d 978 (1975).

■ In this case, Banner included "Terms and Conditions of Sale" with its quotation, but the terms and conditions failed to express clearly whether Banner intended its quotation to be an offer. On the one hand, Banner stated: "Quotations are subject to acceptance within thirty (30) days from date of quotation." PTX 10. This would seem to suggest that the quotation was an offer, which would be held open for 30 days. Moreover, the very fact that Banner included terms and conditions with its price quotation would seem to indicate that it intended the quotation to be an offer. On the other hand, however, Banner stated: "All orders are subject to acceptance by the SELLER at the home office in Saginaw, Michigan USA." *Id.* This statement would appear to contemplate offers by buyers in the form of purchase orders, which would be subject to Banner's acceptance at its home office.

Given that price quotations are typically nothing more than invitations to enter into negotiations, and that Banner's terms and conditions stated that all orders are subject to Banner's acceptance, the Court concludes that Banner's quotation was not an offer. If Banner's quotation were an offer, which empowered Kraft to form a contract through acceptance, then Kraft's purchase order would not be subject to Banner's acceptance at its home office. Rather, a contract would already have been formed. The terms and conditions in Banner's quotation were merely proposed terms and conditions.

Consequently, Kraft's purchase order was not an acceptance. Rather, as in most cases, the purchase order was an offer, as its terms expressly contemplated. The purchase order invited Banner to accept the offer by an express acceptance or by shipment of goods pursuant to the purchase order. Banner accepted Kraft's offer when it shipped the goods to the Richmond plant pursuant to the purchase order.[15]

---

**15.** Even if Banner had intended its quotation to be an offer, which Kraft was empowered to accept, Kraft's purchase order expressly conditioned any acceptance on Banner's assent to the terms and conditions contained in the purchase order. The UCC states that:

A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as

While Kraft's purchase order referenced Banner's proposal, it also stated that the terms and conditions in the purchase order superseded any terms and conditions set forth in any bid by the seller. Thus, the terms and conditions in Kraft's purchase order superseded the terms and conditions in Banner's quotation and constitute the contract between Kraft and Banner. Consequently, the limitation on consequential damages contained in the terms and conditions submitted with Banner's proposal is not part of the contract, but the express warranties contained within the terms and conditions of Kraft's purchase order are part of the contract.

### B. Express Warranty

 Under the UCC, "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." Va.Code § 8.2–313(1)(a). "An affirmation of fact is presumed to be a part of the bargain, and any fact that would remove such affirmation out of the agreement requires clear affirmative proof." *Yates v. Pitman Mfg., Inc.*, 257 Va. 601, 514 S.E.2d 605, 607 (1999) (quoting *Daughtrey v. Ashe*, 243 Va. 73, 413 S.E.2d 336, 339 (1992)) (omitting internal quotation marks). Additionally, "affirmations of fact made by the seller about the

goods during a bargain are regarded as part of the description of those goods; hence no particular reliance on such statements need be shown in order to weave them into the fabric of the agreement." Va.Code § 8.2–313, Official Comment 3. *See also Daughtrey*, 413 S.E.2d at 338. "The issue whether a particular affirmation of fact made by the seller constitutes an express warranty is generally a question of fact." *Bayliner Marine Corp. v. Crow*, 257 Va. 121, 509 S.E.2d 499, 502 (1999). *See also Martin Rispens & Son v. Hall Farms, Inc.*, 621 N.E.2d 1078, 1083 (Ind.1993) ("Although courts decide as a matter of law the existence of express warranties when the representations are in writing, if the writing is ambiguous, then its interpretation is one of fact.").

 Likewise, "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." Va.Code § 8.2–313(1)(b). "Any description of the goods, other than the seller's mere opinion about the product, constitutes part of the basis of the bargain and is therefore an express warranty. It is unnecessary that the buyer actually rely upon it." *Martin v. American Medical Systems, Inc.*, 116 F.3d 102, 105 (4th Cir.1997). Moreover, "[a] description need not be by words. Technical

an acceptance even though it states terms additional to or different from those offered or agreed upon, *unless acceptance is expressly made conditional on assent to the additional or different terms.*
Va.Code § 8.2–207(1) (emphasis added). This section of the UCC applies "only to an acceptance which clearly reveals that the offeree is unwilling to proceed with the transaction unless he is assured of the offeror's assent to the additional or different terms therein." *Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161, 1167 (6th Cir.1972). Kraft's purchase order states: "A PURCHASE OR-

DER WILL BE SUBJECT TO SELLER'S ACCEPTANCE OF THE FOLLOWING TERMS AND CONDITIONS," and expressly rejects the terms and conditions in any bid unless accepted in a signed, written instrument. PTX 26. Kraft's purchase order made clear that it was unwilling to proceed in the absence of Banner's assent to the terms and conditions in the purchase order. Thus, even if Banner's quotation could be construed as an offer, the conditional nature of Kraft's purchase order made it a counteroffer, which thereby rejected the terms of Banner's offer.

specifications, blueprints and the like can afford more exact description than mere language and if made part of the basis of the bargain goods must conform with them." Va.Code § 8.2–313, Official Comment 5. *See also S–C Industries v. American Hydroponics System, Inc.*, 468 F.2d 852, 854–855 (5th Cir.1972) (finding that specifications for greenhouse provided by seller "created an express warranty that the structure as a unit would withstand a vertical load of 20 pounds per square foot."); *Fournier Furniture, Inc. v. Waltz–Holst Blow Pipe Co.*, 980 F.Supp. 187, 190 (W.D.Va.1997)(denying summary judgment and finding that specifications for furnace in seller's quotation could qualify as express warranties).

 Whether the notation in the cut sheet—"MAXIMUM TORQUE 60 FT. LBS."—became an express warranty is a question of fact that the Court must resolve. The Court finds that the maximum torque specification in Banner's cut sheet was an affirmation of fact that the bolts in the insulated pipe joints could be torqued to 60 foot-pounds. Moreover, the maximum torque specification was a description of the goods. While Banner now contends that the maximum torque specification was merely intended to avoid putting too much stress on the bolts such that they would be deformed on a permanent basis, the clear import of the specification was that the bolts in the insulated pipe joints could be torqued to 60 foot-pounds and that the insulated pipe joint would function properly. And, in fact, Glidden stated in his deposition that the purpose of the maximum torque specification was to ensure that the bolts were not under-tightened and informed the installer how much to torque the bolts.

While Banner did not understand its proposal or the purchase order for the impedance pipe heating system to include mechanical engineering services, and indeed Banner has no expertise in the field of mechanical engineering, that is not sufficient to overcome the presumption that Banner's affirmation of fact and description of the goods became a basis of the bargain. Lack of expertise in a particular field does not prevent a party from making an express warranty. "No specific intention to make a warranty is necessary if [an affirmation of fact by the seller or description of the goods] is made part of the basis of the bargain." Va.Code § 8.2–313, Official Comment 3. Nor does the fact that the maximum torque specification was included on a cut sheet, rather than a specifically engineered drawing, overcome the presumption that Banner's affirmation of fact and description of the goods became a basis of the bargain. Banner concedes that the cut sheet shows how an insulated pipe joint kit should be integrated into a mechanical pipe joint in order to upgrade it to a dielectric pipe joint. There was no suggestion by Banner that the information on the cut sheet should not be relied upon by Kraft. And while the cut sheet did not include information for the 2.5" tubing used in part of the Low Trans Oil Project, the cut sheet does not indicate that the maximum torque specification varied according to the dimensions of the tubing.

Thus, the Court finds, as matter of fact, that Banner's affirmation of fact and description of the goods was a basis of the bargain and that Banner expressly warranted that the bolts in the insulated pipe joints could be safely torqued to 60 foot-pounds. Additionally, under the terms of the purchase order, Kraft expressly warranted that the insulated pipe joint kits would conform to the specifications it provided, that they would be of merchantable quality and of good material and workmanship, that they would be free from defect, and that they would be suitable for their

intended use in or with food products. As set forth above, the gaskets in the insulated pipe joints for the Low Trans Oil Project failed because 60 foot-pounds of torque applied too much compressive force on the white nitrile material and caused it to tear. Consequently, the Court finds that Banner breached its express warranty that the bolts could be torqued to 60 foot pounds, as the goods did not conform to the affirmation of fact or description.

### C. Damages

Where a buyer has incurred damages as a result of breach of contract with respect to accepted goods, the UCC provides as follows:

(1) Where the buyer has accepted goods and given notification (subsection (3) of § 8.2–607) he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(3) In a proper case any incidental and consequential damages under the next section [§ 8.2–715] may also be recovered.

Va.Code § 8.2–714.[16] "The 'non-conformity' referred to in subsection (1) includes not only breaches of warranties but also any failure of the seller to perform according to his obligations under the contract." *Id.,* Official Comment 2. "Subsection (2) describes the usual, standard and reasonable method of ascertaining damages in the case of breach of warranty but it is not intended as an exclusive measure." *Id.,* Official Comment 3.

Section 8.2–714(1) "states the general rule for recovery of direct damages." 1 James J. White and Robert S. Summers, *Uniform Commercial Code* § 10–2 (4th ed.1995). While the UCC, as adopted by statute in Virginia, controls the measure of damages for breaches of contract and breaches of warranty involving sales of goods, the Supreme Court of Virginia continues to use the common law definition of direct and consequential damages. *See Pulte Home Corp. v. Parex, Inc.,* 265 Va. 518, 579 S.E.2d 188, 192 (2003) (citing *R.K. Chevrolet, Inc. v. Hayden,* 253 Va. 50, 480 S.E.2d 477, 481 (1997); *Washington & O.D. Ry. v. Westinghouse Elec. & Mfg. Co.,* 120 Va. 620, 627, 89 S.E. 131, 133 (1916)). The Supreme Court has described these categories of damages as follows:

Direct damages are those that flow 'naturally' from a breach of contract; *i.e.,* those that, in the ordinary course of human experience, can be expected to result from the breach, and are compensable. Consequential damages arise from the intervention of 'special circumstances' not ordinarily predictable and are compensable only if it is determined that the special circumstances were within the contemplation of the parties

have had if they had been as warranted. However, Kraft limited its requests and proof to consequential damages, and thus no damages will be awarded under Va.Code § 8.2–714(2). Neither has Kraft sought damages for lost profits.

---

**16.** Kraft has not requested or proved the normal measure of damages in a breach of warranty case under Va.Code § 8.2–714(2). The normal measure of damages in a breach of warranty case is the difference at the time and place of acceptance between the value of the goods accepted and the value they would

to the contract. Whether damages are direct or consequential is a question of law. The determination whether special circumstances were within the parties' contemplation is a question of fact...

*R.K. Chevrolet,* 480 S.E.2d at 481 (citing *Roanoke Hospital v. Doyle and Russell,* 215 Va. 796, 801, 214 S.E.2d 155, 160 (1975)). "Damages within the contemplation of the parties are those actually foreseen or reasonably foreseeable." *Duggin v. Williams,* 233 Va. 25, 353 S.E.2d 721, 723 (1987). *See also* Va.Code § 8.2–715 ("Consequential damages resulting from the seller's breach include (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and (b) injury to person or property proximately resulting from any breach of warranty."); *Blue Stone Land Co., Inc. v. Neff,* 259 Va. 273, 526 S.E.2d 517, 519 (2000) (holding that costs incurred by developer to extend road to purchaser's land were natural consequence of defendant's breach of contract to build road, and thus direct damages); *Chesapeake and Potomac Telephone Co. of Virginia v. Sisson and Ryan, Inc.,* 234 Va. 492, 362 S.E.2d 723, 731 (1987) (affirming trial court's ruling that where grading contractor failed to complete work in accordance with specifications and building collapsed, direct damages included cost of removing and replacing fill); *Roanoke Hospital,* 214 S.E.2d at 160 (holding that interest costs from delay in construction were direct damages); *Pulte Home,* 265 Va. at 527, 579 S.E.2d 188 (holding that damages sought as indemnification were consequential); *R.K. Chevrolet,* 480 S.E.2d at 481 (holding that damages claimed for lost profits were consequential).

 "A plaintiff [ ] must prove two primary factors relating to damages.

First, a plaintiff must show a causal connection between the defendant's wrongful conduct and the damages asserted. Second, a plaintiff must prove the amount of those damages by using a proper method and factual foundation for calculating damages." *Saks Fifth Avenue, Inc. v. James, Ltd.,* 272 Va. 177, 630 S.E.2d 304, 311 (2006) (internal citation omitted). However, "[d]amages need not be established with mathematical certainty. Rather, a plaintiff is required only to furnish evidence of sufficient facts to permit the trier of fact to make an intelligent and probable estimate of the damages sustained." *Estate of Taylor v. Flair Property Associates,* 248 Va. 410, 448 S.E.2d 413, 416 (1994).

 Kraft has proven that the white nitrile gaskets deteriorated because 60 foot-pounds of torque applied too much compressive force to the gaskets. The compressive force pushed the gaskets into the piping and caused them to tear. Ultimately, some pieces of gasket separated inside the piping. All of the losses incurred by Kraft, as to which it requests damages, flowed from the fact that Kraft had to destroy the potentially contaminated Chunky Chips Ahoy! and Chips Ahoy! cookies produced during the low trans fat oil trials. Kraft has met its burden of proof with respect to causation. Thus, the question is whether Kraft has laid an adequate factual foundation and chosen an appropriate measure of the requested damages.

### 1. Losses of Finished Product and Low Trans Fat Oil

 The losses incurred by Kraft as a result of the destruction of Chunky Chips Ahoy! and Chips Ahoy! cookies were consequential damages, as was the loss of the low trans fat oil. Kraft was forced to destroy the product because of the reason-

ably apprehended risk of foreign substance contamination and health hazards in the cookies, which is not a result that flows naturally from breach of an express warranty with respect to maximum torque.[17] Indeed, a number of courts have held that losses incurred because of breaches of warranties that resulted in spoiled or contaminated food were consequential damages. *See, e.g., Corn Plus Co-op. v. Continental Cas. Co.*, 444 F.Supp.2d 981, 990, 2006 WL 2095453, *9 (D.Minn.2006) (noting that losses incurred as a result of bacterial contamination of corn mash, where pipe welds failed to meet specifications, were consequential damages); *Fischer v. General Elec. Hotpoint*, 108 Misc.2d 683, 438 N.Y.S.2d 690 (Dist.Ct. 1981) (noting that losses from spoiled food as a result of defective refrigerator were consequential damages); *Wallich Ice Mach. Co. v. Hanewald*, 275 Mich. 607, 267 N.W. 748, 751 (1936) (holding that defendant was not entitled to damages for loss of meat placed in defective refrigerating plant, which were consequential damages). The Court finds, as a matter of fact, that the potential damage to Kraft food products and food oil were within the contemplation of the parties. Banner was fully aware that the impedance pipe heating system would be used for the Low Trans Oil Project at a Kraft bakery.

Julie Miller, Kraft's controller at the Richmond plant, testified to the national standard budgeted costs of Chunky Chips Ahoy! ($11.25) and Chips Ahoy! ($10.32) cookies, and how those figures are determined. The manufacturing cost of the cookies is based on raw materials and la-

bor, and the costs are assessed at the time of the annual budget unless a significant change in cost indicates that adjustments need to be made to the national standard budgeted cost. Banner presented no evidence to suggest that the May 2003 national standard budgeted costs of Chunky Chips Ahoy! and Chips Ahoy! cookies 2003 were unreliable in determining the manufacturing costs of the cookies. The Court finds that Kraft has sufficiently established that the national standard budgeted cost of the cookies are a reasonable measure of the losses incurred by Kraft in destroying the cookies.

Furthermore, the Court is satisfied that the destruction of the cookies was reasonable. While Kraft did not discover any pieces of white nitrile in the sampled Chunky Chips Ahoy! cookies, the testimony of Dennis Elphick, a quality control executive at Kraft, established that Kraft could not account for all of the missing pieces of gasket material and that Kraft could not sell the product to the public in light of the danger of foreign substance contamination and choking hazards. Kraft's June 10, 2003 letter stated that the costs of a satisfactory inspection would exceed the cost of the product, which is unrebutted by Banner.

Kraft destroyed 28,500 cases of Chunky Chips Ahoy! cookies. At a manufacturing cost of $11.25 per case, that amounts to damages of $320,625. Additionally, Kraft destroyed 6,391 cases of Chips Ahoy! cookies. At a manufacturing cost of $10.32 per case, that amounts to damages of $65,955.12. Thus, Kraft is entitled to dam-

---

**17.** If the damages for the loss of cookies and low trans fat oil could be characterized as direct, Kraft provided the requisite notice under Va.Code § 8.2–714(1). *See Besicorp Group, Inc. v. Thermo Electron Corp.*, 981 F.Supp. 86, 102 (N.D.N.Y.1997) ("The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched."). In the course of performing its investigation into the cause of the gasket failure, Kraft informed Banner of the problem with the gaskets shortly after discovery.

ages of $386,580.12 for the total amount of finished product that it had to destroy because of potential contamination.

With respect to the low trans fat oil, Kraft presented a shipping order and inventory report in support of the fact that Kraft disposed of the low trans fat oil, which went rancid while the Low Trans Oil Project was on hold. According to the inventory report, the cost of the low trans fat oil was $49,539, which is unrebutted. Thus, Kraft is entitled to damages of $49,539 for the loss of the low trans fat oil that went rancid.

### 2. Disposal Costs

■ Clearly, if the manufacturing costs of the destroyed cookies are consequential damages, so are the costs of disposing of the cookies. In the ordinary course of human experience, costs associated with the disposal of finished product would not naturally accompany Banner's breach of warranty as to the maximum torque specification. However, the Court finds, as a matter of fact, that these special circumstances were within the contemplation of the parties at the time of contracting. It was reasonably foreseeable that Kraft would incur costs in disposing of large amounts of finished product as a result of a gasket failure in the low trans fat oil piping.

Kraft presented invoices documenting the amounts that it paid to dispose of the finished product. Evidence presented by bills regular on their face of the amounts charged for a service is itself some evidence that the charges were reasonable and necessary. *See Walters v. Littleton,* 223 Va. 446, 290 S.E.2d 839, 842 (1982). Kraft presented invoices from companies like Browning–Ferris Industries and Waste Management Inc. for the disposal of finished product at various Kraft facilities, totaling $5,725.85. These bills were regu-

lar on their face, and the Court finds that Kraft presented sufficient evidence that the charges were necessary and reasonable. *See Underwriters at Lloyd's London v. OSCA, Inc.,* 2006 WL 941794, *10 (5th Cir.2006) (holding that invoices were sufficient to support jury finding, even though invoices were admitted into evidence through treasurer who could not testify to reasonableness of charges). Thus, Kraft is entitled to $5,725.85 in damages for the costs of disposing of finished product.

### 3. Costs of Sampling

■ Kraft also asserted consequential damages for the labor costs incurred in sampling the 466 cases of Chunky Chips Ahoy! cookies. The Court finds that labor costs associated with the inspection of potentially contaminated product was within the contemplation of the parties at the time of contracting. Moreover, the Court is satisfied that the sampling undertaken by Kraft was a reasonable response to the discovery of the gasket failure, because it was targeted at determining the extent of the contamination of its products. While Kraft ultimately chose to destroy the Chunky Chips Ahoy! and Chips Ahoy! cookies manufactured during the low trans fat oil trials, notwithstanding that it did not discover any pieces of white nitrile material in the sampled cookies, it did so after determining that the cost of satisfactory sampling was prohibitive. Additionally, there can be no doubt that it was necessary for Kraft to clean the piping for food oils after the discovery of the gasket failure.

However, Kraft never presented evidence as to why it was necessary to conduct the sampling over the course of approximately 24 hours, thus requiring Kraft to use temporary employees and to pay a significant amount of overtime to both

hourly and salaried employees. Consequently, the Court finds that Kraft has not met its burden of proving that the overtime costs and the costs of the temporary employees were necessary and reasonable. With respect to the overtime wages paid for cleaning the food oil piping, however, the Court is satisfied that it was necessary to act expeditiously to return the production lines to operation.

Kraft also presented no evidence as to why it was necessary to conduct sampling on office chairs, which then had to be steam cleaned. Nor did Kraft present documentation to explain and account for the travel and entertainment expenses of employees that it sent to the Richmond plant to deal with the gasket problem. Thus, Kraft has not met its burden to prove that the claimed expenses incurred in respect of those matters were necessary and reasonable.

Kraft's business records indicate that it devoted 565 hours to cleaning its food oil piping, all of which was paid at overtime rates. At the overtime wage rate of $33.41 plus the fringe benefit rate of $15.14, this amounts to $27,425.10 in damages. With respect to the sampling conducted, Kraft's hourly employees worked 667 hours. At the regular hourly wage rate of $20.25 plus the fringe benefit rate of $15.14, this amounts to $23,605.13 in damages.

#### 4. Storage and Demurrage Charges

Kraft also seeks damages for the charges it incurred for storage of its finished product in June and July 2003, at Buena Park and the Richmond plant, before the product was destroyed. However, Kraft failed to explain or prove why it was necessary to store the finished product rather than simply destroying it. Thus, Kraft has not met its burden of proof as to those components of its claimed damages.

With respect to the demurrage charges, Kraft failed to demonstrate that its inability to unload the raw ingredients was tied to the gasket failure. Moreover, Kraft presented no documentary support for the requested $3,200 in damages. Indeed, the $3,200 figure was pulled from an internal e-mail in which the costs of demurrage were estimated beforehand. The Court cannot rely on evidence of that ilk to establish the charges incurred, and thus no damages will be awarded for demurrage charges.

#### 5. Duty to Mitigate

An alleged failure to mitigate "damages is an affirmative defense, and its burden is entirely on the contract breaker." *Foreman v. E. Caligari & Co.*, 204 Va. 284, 130 S.E.2d 447, 451 (1963). While Kraft failed to explain why it gave away some of its finished product to Bakery Feeds for use as animal feed, rather than selling it for that purpose as anticipated, Banner has not presented any evidence that Kraft forewent an opportunity to sell the finished product. Nor has Banner presented other evidence from which the Court could infer that Kraft failed to take all reasonable actions to mitigate its damages. Indeed, Kraft sent letters to Banner with the express purpose of seeking to mitigate damages. Thus, Banner has failed to meet its burden in asserting the affirmative defense of failure to mitigate.

#### 6. Indemnification Clause/Attorney's Fees

Kraft also asserts that it is entitled to attorney's fees under the "Indemnification; Insurance" provision in the purchase order. The indemnification clause provides in pertinent part that

> Seller shall defend, indemnify, and hold Buyer harmless against all damages, claims, liabilities, and/or expenses (in-

cluding attorneys' fees) arising out of or resulting in any way from any defect in the goods purchased hereunder, from any act or omission of Seller, its employees, agents or subcontractors, of from Seller's breach of any warranty as provided herein or otherwise by law.

PTX 26. Kraft argues that the indemnification clause allows it to recover attorney's fees from Banner because Kraft incurred attorney's fees arising out of Banner's breach of the express warranty with respect to the maximum torque specification. Banner contends that the indemnification clause is limited in scope to claims involving third parties.

■■■■■■ "In general, attorney's fees are not recoverable as damages. However, one exception to this general rule is where the parties by contract agree that attorney's fees will be recoverable." *East Texas Salvage & Mach. v. Duncan*, 226 Va. 160, 306 S.E.2d 896, 897 (1983). A "contract is to be construed as a whole, and effect given to every provision thereof if possible. No word or paragraph can be omitted in construing the contract if it can be retained and a sensible construction given to the contract as a whole." *IMWA Equities IX Co. v. WBC Associates*, 961 F.2d 480, 483–484 (4th Cir.1992) (quoting *Ames v. American Nat'l Bank of Portsmouth*, 163 Va. 1, 176 S.E. 204, 216 (1934)). Moreover, "Virginia courts adhere to the 'plain meaning' rule of interpreting contracts, whereby clear and explicit language in a contract is to be taken in its ordinary signification, and, if the meaning is plain when so read, the instrument must be given effect accordingly." *Id.* at 484 (quoting *Davis v. Davis*, 239 Va. 657, 391 S.E.2d 255, 257 (1990)) (internal quotation marks omitted). And, of course, "[i]ndemnity agreements are subject to general rules of contract construction." *Wellmore Coal*

*Corp. v. Patrick Petroleum Corp.*, 808 F.Supp. 529, 533 (W.D.Va.1992).

According to Black's Law Dictionary, "to indemnify" is "[t]o reimburse (another) for a loss suffered because of a third party's or one's own act or default." Black's Law Dictionary (8th ed.2004). Thus, the plain meaning definition of indemnification does not limit reimbursement to losses suffered as a result of third party claims. Indeed, the Supreme Court of Virginia has rejected the argument that broadly worded indemnification agreements limit reimbursement for attorney's fees to cases where the plaintiff has been forced to maintain or defend an action against a third party. *See Chesapeake and Potomac Telephone*, 362 S.E.2d at 728–729 (holding that plaintiff was entitled to attorney's fees under indemnification clause and rejecting argument to the contrary as misreading of *Hiss v. Friedberg*, 201 Va. 572, 112 S.E.2d 871, 875–76 (1960)); *Rappold v. Indiana Lumbermens Mut. Ins. Co.*, 246 Va. 10, 431 S.E.2d 302, 304 (1993) (same); *Coady v. Strategic Resources, Inc.*, 258 Va. 12, 515 S.E.2d 273, 275 (1999) (same). The cases cited by Banner for a contrary position preceded the Supreme Court of Virginia's pronouncement in *Chesapeake and Potomac Telephone*, and have been distinguished by the Supreme Court of Virginia in subsequent cases. *See Tony Guiffre Distributing Co. v. Washington Metropolitan Area Transit Authority*, 740 F.2d 295, 298 (4th Cir.1984); *Tidewater Construction Corp. v. Southern Materials Co.*, 269 F.Supp. 1000, 1006 (E.D.Va.1967). Given the broad language in the indemnification clause and the plain meaning of that language, the Court finds that Kraft could recover attorney's fees under the indemnification clause where the fees arose from Banner's breach of an express warranty.

■■■ However, Kraft is not entitled to attorney's fees in this case because it failed

to prove a contingency fee arrangement or otherwise present evidence of attorney's fees at trial. "Claims for attorneys' fees and related non-taxable expenses shall be made by motion unless the substantive law governing the action provides for recovery of such fees as an element of damages to be proved at trial." Fed.R.Civ.P. 54(d)(2)(A). The Advisory Committee Note to this subsection, adopted in 1993, cites attorney's fees recoverable under the terms of a contract as an example of a case where fees are an element of damages that must be proved at trial. *See Carolina Power and Light Co. v. Dynegy Marketing and Trade,* 415 F.3d 354, 358–359 (4th Cir.2005). While attorney's fees will not always be an element of damages where a contract provides for such recovery, the primary exception to the general rule that such fees must be proved at trial is where the contract provides for recovery of attorney's fees by the prevailing party. *See Capital Asset Research Corp. v. Finnegan,* 216 F.3d 1268, 1270 (11th Cir.2000).

In this case, the indemnification clause did not provide for attorney's fees to be paid to the prevailing party. Rather, the indemnification clause provided for attorney's fees as an element of damages. Consequently, the matter of attorney's fees was not collateral to the merits of the underlying case and had to be proved by Kraft at trial.

Where attorney's fees are an element of damages, such as in an indemnification clause, the award of attorneys' fees should be denied where the party seeking them fails to carry its burden of proof at trial. *See Pride Hyundai, Inc. v. Chrysler Financial Company, LLC,* 355 F.Supp.2d 600, 603 (D.R.I.2005) (denying attorney's fees provided for in contract where counterclaim plaintiff did not present evidence in support thereof at trial); *Lynch v. Sease,* 2006 WL 1206472, *5 (E.D.Ky.2006)

(unpublished) (same). At trial, Kraft did not present evidence of a contingency fee agreement or the otherwise reasonable attorney's fees. Instead, Kraft has asked permission to prove its attorney's fees if the Court should determine that it is entitled to them. However, Kraft had its opportunity under Rule 54 to prove its attorney's fees at trial, and chose not to do so. The parties could have agreed to litigate the matter of attorney's fees after the trial on the breach of warranty claim, but did not. *See Clarke v. Mindis Metals, Inc.,* 99 F.3d 1138, 1996 WL 616677, *9 (6th Cir. 1996) (unpublished). Consequently, Kraft has lost its opportunity to prove its entitlement to attorney's fees, and none will be awarded.

### 7. Prejudgment and Post–Judgment Interest

Kraft also has requested the award of prejudgment interest, though it does not specify on what date it believes prejudgment interest commence. Virginia has provided by statute that

> In any action at law or suit in equity, the verdict of the jury, or if no jury the judgment or decree of the court, may provide for interest on any principal sum awarded, or any part thereof, and fix the period at which the interest shall commence. The judgment or decree entered shall provide for such interest until such principal sum be paid.

Va.Code § 8.01–382. As the Supreme Court of Virginia has noted

> [b]y its express language, Code § 8.01–382 draws an important distinction between prejudgment and postjudgment interest. This section provides for the discretionary award of prejudgment interest by the trier of fact, who 'may provide for' such interest and fix the time of its commencement. The accrual of postjudgment interest, however, is

mandatory; the entire amount of a judgment or decree 'shall bear interest' from its date of entry.

Underlying this distinction is the principle that prejudgment interest is normally designed to make the plaintiff whole and is part of the actual damages sought to be recovered. In contrast, postjudgment interest is not an element of damages, but is a statutory award for delay in the payment of money actually due.

*Dairyland Ins. Co. v. Douthat,* 248 Va. 627, 449 S.E.2d 799, 801 (1994) (quoting *Monessen Southwestern Ry. v. Morgan,* 486 U.S. 330, 335, 108 S.Ct. 1837, 100 L.Ed.2d 349 (1988)) (internal citations and quotation marks omitted).

However, Kraft has not demonstrated that it is appropriate for the Court to exercise its discretion to award prejudgment interest in this case, and thus it will not be awarded. Post-judgment interest will accrue as of the date of the judgment and at the federal judgment rate of interest. 28 U.S.C. § 1961.

## CONCLUSION

For the foregoing reasons, judgment will be entered for Banner on Count I. Judgment will be entered for Kraft on Count III in the amount of $492,915.20 with post-judgment interest from the date that judgment is entered.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.