**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

AUDIO VISUAL ASSOCIATES,
INCORPORATED, t/a Ritz Audio Visual
Associates, Incorporated,
<u>Plaintiff-Appellant,</u>

v.

No. 98-2113

SHARP ELECTRONICS CORPORATION,
<u>Defendant-Appellee.</u>

and

DOUGLAS STEWART COMPANY,
<u>Defendant.</u>

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Peter J. Messitte, District Judge.
(CA-97-3816-PJM)

Argued: February 29, 2000

Decided: April 20, 2000

Before NIEMEYER, MICHAEL, and TRAXLER, Circuit Judges.

_____

Affirmed by published opinion. Judge Niemeyer wrote the opinion,
in which Judge Michael and Judge Traxler joined.

_____

**COUNSEL**

**ARGUED:** Sylvia Jiva Rolinski, Silver Spring, Maryland, for Appel-
lant. Brett Ingerman, PIPER & MARBURY, L.L.P., Baltimore, Mary-

land, for Appellee. **ON BRIEF:** Henry R. Lord, Anthony L. Meagher, PIPER & MARBURY, L.L.P., Baltimore, Maryland, for Appellee.

_____

**OPINION**

NIEMEYER, Circuit Judge:

Based on its efforts to purchase 1,400 calculators from Sharp Electronics Corporation, Audio Visual Associates, Inc., filed this action against Sharp for breach of contract, tortious business conduct, and violation of the antitrust laws. On Sharp's motion to dismiss filed under Federal Rule of Civil Procedure 12(b)(6), the district court dismissed Audio Visual's amended complaint. We affirm.

I

The allegations of Audio Visual's amended complaint, which at this stage of the proceedings we take to be true even though the allegations relate a somewhat incoherent series of events, state that Audio Visual contacted Sharp with the intent to purchase a number of Sharp brand, graphing calculators (Model EL-9200C). Audio Visual planned to resell the calculators to Corporate Systems Resources, Inc. ("CSR"), a "socially and economically disadvantaged small business concern" under § 8(a) of the Small Business Act, 15 U.S.C. § 637(a), which had received an award from the United States Navy to supply the Navy with 1,400 calculators. Sharp, which was aware of Audio Visual's arrangement with CSR and CSR's award from the Navy, quoted Audio Visual a price of $62.99 per calculator. Based on this quotation, Audio Visual contracted with CSR to provide it with the 1,400 calculators for $71.00 each, and CSR contracted to provide the Navy with the calculators at a sum not alleged in the complaint. Two days later, on January 25, 1995, Sharp orally informed Audio Visual that it had decided to "dump" the EL-9200C calculators and "quoted a price of $31.00 per unit." Pursuant to a "typical long-standing business practice" with Sharp, Audio Visual thereupon faxed Sharp a purchase order for 1,400 calculators at $31.00 per unit. The purchase order included the following language:

2

PLEASE ADVISE OUR COST IF CASH IS PROVIDED
WITH ORDER

* * * * *

DO NOT RELEASE ORDER BEFORE YOU [HAVE]
RECEIVED WRITTEN OR VERBAL AUTHORIZATION
FROM GARY LUNSFORD OR BOB DVORAK

The purchase order was signed by Bob Dvorak as Audio Visual's
executive vice president and owner.

On the same day that Audio Visual faxed Sharp the purchase order,
a Sharp employee called Audio Visual demanding "to know the iden-
tity of the customer buying the calculators [and] asking whether it
[was] the Navy and whether [Audio Visual] was acting as a broker
for an `underprivileged firm.'" Sharp then advised Audio Visual that
it "was not going to obtain the order at any price." When Audio
Visual contacted another employee at Sharp to inquire about the sta-
tus of its order, the employee stated that the calculators were "sold
out." The complaint alleges that at that time Sharp actually had "at
least 30,145 units then in stock."

During this same period, Audio Visual alleges, Sharp approached
the Navy directly and offered to provide it with the calculators, along
with some projectors, if the Navy would cancel its contract with CSR.
Audio Visual alleges that the Navy did cancel the CSR contract and
that this caused CSR to cancel its contract with Audio Visual. When
Audio Visual called Sharp again, Sharp again stated that the calcula-
tors were sold out and that, in any event, it would not ship Audio
Visual the calculators.

Less than two weeks later, Sharp informed Audio Visual that its
EL-9200C calculators were now available at $31.00 each. Accord-
ingly, Audio Visual faxed Sharp a purchase order for 1,400 calcula-
tors at this price. When Audio Visual followed up with a telephone
call, however, Sharp stated that the calculators were sold out and that
Audio Visual's order would not be filled. But Sharp referred Audio
Visual to the Douglas Stewart Company ("DSC") in Wisconsin, one
of Sharp's distributors.

3

When Audio Visual called DSC, DSC quoted a price of $29.95 per calculator. Shortly after providing this quotation, however, DSC told Audio Visual that the calculators had a new price of $31.00 because "Sharp says $31.00 is the fixed price." Ultimately, Audio Visual completed a transaction with DSC and purchased 1,400 calculators at the price of $31.00 each. Audio Visual then sold the calculators to CSR, which in turn provided them to the Navy.

Audio Visual filed this action against Sharp and DSC, alleging (1) breach of a contract to sell Audio Visual calculators at $31.00 each, (2) intentional interference with existing contractual relations between Audio Visual and CSR, (3) intentional interference with prospective economic advantage and business relations, (4) fraud and misrepresentation, (5) negligent misrepresentation, and (6) price fixing. Audio Visual sought $100,000 in compensatory damages, treble damages on the antitrust claim, $3 million in punitive damages, and attorneys fees.

On the defendants' motion to dismiss made under Federal Rule of Civil Procedure 12(b)(6), the district court dismissed the complaint. It concluded that Audio Visual's faxed purchase order was at most an offer that was rejected by Sharp and that no contract between Sharp and Audio Visual for the sale of calculators ever came into existence. On the intentional interference claims, the court concluded that because the alleged interference involved a contractual relationship between Sharp, Audio Visual, CSR, and the Navy,"effectively what you've got is, one of the parties to the contract alleging interference with the contract by another party to the contract, to the overall contract, which essentially you cannot do." With respect to the fraudulent and negligent misrepresentations, the court concluded that the statement by Sharp that it was sold out was not a representation upon which Audio Visual could have reasonably relied. The court concluded that the statement was simply a refusal to deal, which is not actionable. Finally, the court dismissed the price-fixing claim because there was no indication of agreement or concerted action between Sharp and DSC.

Because Audio Visual settled its claims against DSC, it filed this appeal only with respect to the district court's order dismissing its complaint against Sharp.

4

II

For its principal argument on appeal, Audio Visual contends that it adequately alleged the formation of a contractual relationship between it and Sharp under which Sharp agreed to sell Audio Visual 1,400 calculators at $31.00 each and that Sharp illegally refused to honor the contract. Audio Visual points to its allegations that Sharp "quoted a price of $31.00 per unit" and that "pursuant to typical long-standing business practice, it faxed a purchase order to Sharp," a copy of which it attached to the complaint. As Audio Visual characterizes this exchange in its complaint, "[Audio Visual] accepted an offer of Sharp to provide the calculators at a specified price. A complete contract between the parties was created."

Sharp contends that Audio Visual's purchase order amounted to "nothing more than an offer requiring acceptance of its terms to create a contract" and that Sharp was fully within its rights to reject the purchase order. It argues that if we were to rule otherwise, purchasers would be able "to create legally enforceable contracts simply by sending or faxing a purchase order to the seller." Moreover, Sharp notes, if sending a purchase order were held to create a contract, then a seller would never be able to reject an order or refuse to deal.

The commercial exchange between Audio Visual and Sharp was not unusual as far as it went, and the significance of each exchange is readily defined either by common law or the Uniform Commercial Code. Daily, sellers provide quotations on prices and delivery, and daily, buyers place purchase orders to acquire goods pursuant to these quotations. Often, the terms of proposed transactions are modified by oral or written communications and transactions are finalized simply by performance and payment in accordance with the latest proposals. This facility and flexibility in commercial transactions involving the sale of goods is specifically contemplated by the Uniform Commercial Code. See Md. Code Ann., Com. Law § 1-102(2).*

_____

*Section 1-102(2) provides that the purposes of the Uniform Commercial Code are:

> (a) To simplify, clarify and modernize the law governing commercial transactions;

> (b) To permit the continued expansion of commercial practices through custom, usage and agreement of the parties;

> (c) To make uniform the law among the various jurisdictions.

5

Under the Code, buyers and sellers may freely exchange purchase orders, faxes, and telephone calls relating to a proposed transaction without incurring contractual obligations unless and until the essential requirement for contract formation is satisfied-- i.e. that there be an objective manifestation of mutual assent by the parties (sometimes referred to as a "meeting of the minds"). See Maryland Supreme Corp. v. Blake Co., 369 A.2d 1017, 1023 (Md. 1977); World Ins. Co. v. Perry, 124 A.2d 259, 267 (Md. 1956); Restatement (Second) of Contracts § 17(1) ("the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration"). The manifestation of mutual assent ordinarily takes the form of an offer by one party followed by an acceptance by the other party. See Blake, 369 A.2d at 1025. In determining whether a proposal by one party amounts to an offer, we must ask whether it can be accepted to create an enforceable arrangement. See Restatement (Second) of Contracts § 24 ("An offer is the manifestation of willing-ness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will con-clude it").

In this case, Sharp quoted a price of $31.00 per unit, a quotation that Audio Visual claims it "accepted" to form a binding contract. This argument, however, does not withstand closer scrutiny. Audio Visual cannot maintain that upon its receipt of a price quotation from Sharp, it could have formed a binding contract to purchase, for exam-ple, 1.5 million units -- a proposition yet more untenable if it turned out that Sharp were unable to deliver 1.5 million units. Price quota-tions are a daily part of commerce by which products are shopped and commercial transactions initiated. Without more, they amount to an invitation to enter into negotiations, but generally they are not offers that can be accepted to form binding contracts. See Blake, 369 A.2d at 1024; see also Dyno Constr. Co. v. McWane, Inc., 198 F.3d 567, 572 (6th Cir. 1999) (noting that a price quotation is usually consid-ered an invitation for an offer); Interstate Indus., Inc. v. Barclay Indus., Inc., 540 F.2d 868, 870-73 (7th Cir. 1976) (discussing distinc-tions between a price quotation and an offer). It would bring an end to the competitive practice of shopping products if every quotation exposed the "quoter" to an enforceable contract on whatever terms the "quotee" chose, regardless of product availability.

6

Typically, a seller's price quotation is an invitation for an offer, and the offer usually takes the form of a purchase order, providing product choice, quantity, price, and terms of delivery. The Uniform Commercial Code provides that the seller can accept such an offer in any of several ways, often determined by custom and practice. <u>See</u> Md. Code Ann., Com. Law §§ 2-204(1), 2-206(1), 2-208. Frequently, the seller accepts the offer of a purchase order by a written acknowledgment, which also provides a shipping date for the product. The seller may also accept simply by performance and delivery of the goods. A seller, however, must also be free to reject the terms of the purchase order and to propose alternative terms. In this case, Sharp did reject Audio Visual's purchase order, stating explicitly that it would not fill the order. Audio Visual has not alleged the existence of any evidence that would suggest otherwise.

While Audio Visual alleges that custom and practice governed its purchases from Sharp, this allegation does not indicate that it was Sharp's practice to treat Audio Visual's purchase orders as binding on Sharp. And logic would dictate otherwise. Just because Sharp quotes a price, it cannot be said to have agreed to other essential terms that a purchaser might propose in its purchase order with respect to quantity, delivery, and payment. The most that the custom and practice as alleged in this case could suggest is that when Sharp filled Audio Visual's purchase orders, it thereby signaled its acceptance of those orders.

But in the specific transaction before us, it is yet more apparent that a contract was never formed. Audio Visual's purchase order in this instance was conditional, and it did not amount to an offer that could, without satisfaction of the condition by Audio Visual, be accepted by Sharp. Audio Visual's purchase order was conditioned on receipt from it of "written or verbal authorization from Gary Lunsford or Bob Dvorak." Until such authorization was received, Sharp could not bind Audio Visual to the order submitted.

Despite Audio Visual's inability to demonstrate a meeting of the minds with Sharp on the essential terms of a transaction, Audio Visual contends, in conclusory terms, that its purchase order became the basis of a contract "pursuant to typical long-standing business practice," as recognized by the Uniform Commercial Code. It points

7

first to § 2-207(3), which provides that "[c]onduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract." But this section "contemplates contract formation through performance." Avedon Engineering, Inc. v. Seatex, 126 F.3d 1279, 1284 n.10 (10th Cir. 1997) (quoting 1 White & Summers, Uniform Commercial Code § 1-3, at 25-26 (4th ed. 1995)). Here, the complaint does not allege that Sharp performed pursuant to the purchase order -- it did not ship the goods to Audio Visual -- and Audio Visual alleges no other conduct by either party to evidence a contract.

Audio Visual also points to § 2-204(1), which allows that a "contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." This provision, however, is not helpful to Audio Visual because again it has failed to allege "conduct" by Sharp that "recognizes the existence" of an agreement.

Finally, Audio Visual points to § 1-205(3), which provides that "[a] course of dealing between parties . . . give[s] particular meaning to and supplement[s] or qualif[ies] terms of an agreement." This section, however, does not suggest that a course of dealing may in and of itself provide the basis for a contract. Rather, it supplies a mode of interpretation for construing existing contracts. See, e.g., Snyder v. Herbert Greenbaum & Assocs., Inc., 380 A.2d 618, 622 (Md. 1977) ("`course of dealing' is an interpretative device to give meaning to the words and terms of an agreement"). In short, Audio Visual does not allege, either by course of conduct or otherwise, that it and Sharp mutually assented to a transaction for the purchase and sale of 1,400 calculators at $31.00 per calculator.

In addition to its failure to allege any manifestation of mutual assent, Audio Visual's complaint also demonstrates on its face that any alleged contract would be unenforceable because it did not satisfy the Uniform Commercial Code's statute of frauds. Section 2-201(1) provides:

> Except as otherwise provided in this section, a contract for the sale of goods for the price of $500 or more is not

8

enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought.

Undisputedly, Sharp did not sign any document agreeing to sell calculators at $31.00 each (for a total of $43,400) and did not return any writing to Audio Visual acknowledging or purporting to accept, even in an imperfect manner, Audio Visual's purchase order. Yet Audio Visual argues that its claim falls within the exception to the statute of frauds included in § 2-201(2), which provides:

Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received.

Audio Visual maintains that its purchase order was in fact the "writing in confirmation" of a preexisting contract referred to in § 2-201(2). However, Audio Visual never alleges that it had, before transmission of the purchase order, accepted Sharp's price quotation. Section 2-201(2) only refers to a writing "in confirmation of the contract." (Emphasis added). Accordingly, for this provision to excuse compliance with the statute of frauds, Audio Visual would have to allege that a contract existed and that it sent the purchase order in confirmation of the contract within a reasonable time thereafter. See, e.g., R.S. Bennett & Co. v. Economy Mechanical Indus., Inc., 606 F.2d 182, 185-86 (7th Cir. 1979). In sending its purchase order in this case, however, Audio Visual sought to form a contract, rather than confirm one.

In sum, the complaint alleges a price quotation by Sharp and Audio Visual's responsive issuance of a purchase order for 1,400 units at the quoted price, but it alleges no mutual assent to any commercial transaction and no writing signed by Sharp to satisfy the statute of frauds. Therefore, Audio Visual's complaint fails to allege a contract on which to base a breach-of-contract claim.

9

III

Audio Visual's tort allegations were also properly dismissed. Audio Visual alleged in its complaint that Sharp interfered with its contractual relationship and prospective economic advantage in bypassing Audio Visual and CSR and contacting the Navy directly to sell it the calculators. Audio Visual also alleged that Sharp fraudulently and negligently misrepresented first that it had calculators to sell at $31.00 and then that it was out of stock when in fact it had an inventory of more than 30,000 calculators.

To support its claim of intentional interference with an existing contract, Audio Visual must allege, inter alia , "[t]he existence of a contract or a legally protected interest between the plaintiff and a third party" and "the defendant's intentional inducement of the third party to breach or otherwise render impossible the performance of the contract." Bagwell v. Peninsula Regional Medical Ctr., 665 A.2d 297, 313 (Md. Ct. Spec. App. 1995). But Audio Visual does not allege that Sharp induced CSR to breach its contract with Audio Visual. Rather, it alleges that Sharp contacted the Navy directly, thereby allegedly interfering with the contract between the Navy and CSR. Because Audio Visual was not a party to this contract, Audio Visual fails to allege that Sharp induced a party with which Audio Visual had a contract to "breach or otherwise render impossible the performance of the contract." Id. Moreover, Audio Visual also does not claim that the Navy and CSR entered into a contract with the intent to benefit Audio Visual, such that Audio Visual had a "legally protected interest" as a third-party beneficiary. See Flaherty v. Weinberg, 492 A.2d 618, 622 (Md. 1985).

To state a claim of tortious interference with its prospective economic advantage, Audio Visual must allege:

> (1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting.

10

Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs., Inc., 650 A.2d 260, 269 (Md. 1994) (citation omitted). Audio Visual, though, never alleges the necessary "unlawful purpose" of Sharp. The only allegations touching on this element are Sharp's knowledge of CSR's contract with the Navy and Audio Visual's contract with CSR, Sharp's statements that Audio Visual would not get the calculators "at any price," Sharp's false claim that it had no calculators, and Sharp's offer to provide the Navy with calculators and projectors. These allegations, without more, do not support a necessary claim of "violence or intimidation, defamation, injurious falsehood or other fraud, violation of the criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith." K & K Management, Inc. v. Lee, 557 A.2d 965, 979 (Md. 1989) (citation omitted).

Finally, to support its claim of fraudulent misrepresentation based on Sharp's false offer to sell the calculators for $31.00 each and its later false statement that the calculators were sold out, Audio Visual must allege that it justifiably relied on the misrepresentations and, as a result, suffered compensable damages. See Alleco, Inc. v. Harry & Jeanette Weinberg Found., Inc., 665 A.2d 1038, 1047 (Md. 1995). Similarly, to support its negligent misrepresentation claim, Audio Visual must allege that it had justifiably taken action in reliance on the statements and suffered damages proximately caused by Sharp's negligence. See Martens Chevrolet, Inc. v. Seney , 439 A.2d 534, 539 (Md. 1982). But Audio Visual has failed to allege its appropriate reliance on the statements. Because Audio Visual was able to obtain the calculators at a per-calculator price of $31.00 from DSC and thereby to fill CSR's order, Sharp's refusal to sell the calculators also caused no damage. Although Audio Visual states that it lost its business relationship with CSR, there is no indication that Audio Visual's loss of that relationship is attributable to its reliance on Sharp's statements.

IV

Finally, Audio Visual alleges that it was damaged in its business or property by Sharp's price fixing, in violation of § 1 of the Sherman Act, 15 U.S.C. § 1, and § 4 of the Clayton Act, 15 U.S.C. § 15. It bases this claim on its allegations that, although DSC originally quoted Audio Visual a price of $29.95 per calculator, an hour later, DSC informed Audio Visual that the price per calculator was $31.00

11

because "Sharp says $31.00 is the fixed price." But, as the district court observed, there is no allegation that the $31.00 price was the product of an illegal contract, combination, or conspiracy. The complaint only states, "based upon Sharp's intervention with the DSC the price was changed to $31.00 per unit." These allegations are insufficient to allege an illegal price-fixing arrangement. See Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 n.9 (1984) ("The concept of `a meeting of the minds' or `a common scheme' in a distributor-termination case includes more than a showing that the distributor conformed to the suggested price. It means as well that evidence must be presented both that the distributor communicated its acquiescence or agreement, and that this was sought by the manufacturer"); United States v. Colgate & Co., 250 U.S. 300, 307 (1919) (the Sherman Act does not restrict a manufacturer's right to "announce in advance the circumstances under which he will refuse to sell").

For the reasons given, we affirm the judgment of the district court dismissing Audio Visual's amended complaint.

AFFIRMED

12