**In re WHEELING–PITTSBURGH STEEL CORP., Debtor.**

**Triad Metals, Inc. Plaintiff,**

**v.**

**Wheeling–Pittsburgh Steel Corp. Defendant.**

**No. 06–3100.**

United States Bankruptcy Court, N.D. Ohio.

Aug. 31, 2006.

Alicia J. Blumenfeld, Detroit, MI, Stuart A. Laven, Cleveland, OH, Monica M. Moore, Bodman, Longley & Dahling, Detroit, MI, Robert C. Psaropoulos, Benesch, Friedlander, Coplan & Aronoff, Cleveland, OH, Jeffrey G. Raphelson, Detroit, MI, for Plaintiff.

Walter A. Bunt, Kirkpatrick & Lockhart, Pittsburgh, PA, Richard D. Dworek, Kirkpatrick & Lockhart, Pittsburgh, PA, Miles T. Macik, Butzel Long, Bloomfield Hills, MI, Ronald M. McMillan, Cleveland, OH, David H. Oremann, Bloomfield Hills, MI, for Defendant.

### *MEMORANDUM OPINION AND DECISION*

RICHARD L. SPEER, Bankruptcy Judge.

This cause is before the Court on the opposing Parties' Dispositive Motions: the Defendant/Debtor's Motion for Summary Judgment as to the Plaintiff's complaint as well as on its counterclaim against Plaintiff; and the Plaintiff's Motion for Partial Summary Judgment as to the affirmative

defenses raised by the Defendant against the Plaintiff's complaint. On these respective Motions, both of the Parties filed multiple supporting memoranda, as well as numerous supporting documents. After having had the opportunity to review the arguments of the Parties in light of their evidentiary materials, the Court, for the reasons now explained, finds that the Defendant's Motion for Summary Judgment should be Granted and, as a result, the Plaintiff's Partial Motion for Summary Judgment must be Denied.

## FACTS

The Debtor/Defendant, Wheeling–Pitt Steel Corporation (hereinafter "WPSC"), is a manufacturer of flat-rolled steel products. In the latter part of 2000, WPSC sought to reorganize its business affairs by commencing a case under Chapter 11 of the United States Bankruptcy Code. WPSC's efforts were ultimately successful, with a plan of reorganization being confirmed by the bankruptcy court in May of 2003. In its plan of reorganization, it was provided that administrative claims would be paid "in accordance with the terms and provisions of the particular transaction and agreements relating thereto." (Section 2.1(b)(ii)).

The Plaintiff, Triad Metals, Inc. (hereinafter "TMI"), currently no longer in operation, was a steel servicing center, and customer of WPSC. During the progression of WPSC's bankruptcy case, TMI requested a fixed-price contract for six months in duration. Based upon this request, WPSC provided TMI a price quote, by facsimile, dated October 11, 2001; the relevant terms therein provided:

Subject: Six Month Pricing HR/CR Package

Wheeling–Pittsburgh Steel Corp. is pleased to offer the following HR and CR pricing for your inquiry of October 8th, 2001.

HR—$12.50/cwt Base

CR—$16.50/cwt Base

This price will be valid from November 2001 through April 2002.

Drew Conti

Sales Representative

Wheeling–Pittsburgh Steel Corp.

(Doc. No. 50, Ex. No. 1).

Based upon the quote's duration, the price for steel stated therein was greater than the "spot rate," or current market rate, for the product at that particular time. Because of this, TMI did not place an immediate order on this quote, but instead requested "spot quotes" for the coming months of December and January. In response, WPSC, like before, provided TMI a price quote by facsimile. Except with regards to the quote's duration and price, the structure of this quote was substantially the same as the one previous, setting forth, in relevant part:

Subject: HR/CR offer

Wheeling–Pittsburgh Steel Corp. is pleased to offer the following based prices for you inquiry of November 20th, 2001.

December HR—$10.75/cwt Base

January HR—$11.00/cwt Base

January CR—$15.25

These prices are based upon 5000 Tons per Month of HR and 1500 Tons per Month of CR.

Drew Conti

Sales Representative

Wheeling–Pittsburgh Steel Corp.

(Doc. No. 50, Ex. No. 2). Based upon these terms, TMI placed several orders for steel from WPSC. Such an arrangement also occurred for steel orders placed in February and March of 2002; the only substantive difference being that under the

terms of the new quote from which TMI placed its orders, WPSC's prices were slightly higher so as to reflect the new "spot rate" for steel. (Doc. No. 50, Ex. No. 3).

In February of 2002, this process—of WPSC offering spot quotes from which TMI would place its orders—then began to repeat itself, with WPSC submitting to TMI a quote for product purchases that would be made in April of 2002. (Doc. No. 50, Ex. No. 4). Like the previous two "spot quotes," the only substantive difference in the terms of this quote was the price. But as to price, there existed this critical difference: the "spot rate" for its steel products now exceeded that as first quoted by WPSC the previous October when it offered its fixed pricing for a period of six months. As a direct result, TMI declined to place an order on this quote, instead requesting that the prices offered in the October quote be honored.

The first of these requests took place in early March of 2002, and ended with TMI sending WPSC a formal purchase order, dated April 29, 2002, for 10,000 tons of hot rolled steel. WPSC, however, refused to process any orders under its October quote, taking the position that TMI had previously rejected the offer. All the same, the Parties continued to do business together.

From October to November of 2003, after both the confirmation and "effective date" of the plan of reorganization, TMI placed numerous orders with WPSC for additional product. WPSC filled these orders, but TMI has yet to pay for the orders. The balance owed on these orders is $654,280.03, plus interest.

## PROCEDURE

As a result of WPSC declining to honor its October quote, TMI commenced this action, alleging two grounds for recovery: breach of contract and promissory estoppel.[1] In its Answer, WPSC denied the existence of these grounds for recovery, and also raised a number affirmative defenses, including: res judicata, on account of the WPSC's plan being confirmed without TMI having filed a claim by the bar date; the lapse of the October quote by operation of law; waiver; estoppel; unclean hands; and failure to mitigate damages.[2] (Doc. No. 24, Ex. A). WPSC also counterclaimed to recover the $654,280.03 it alleges is due for the postconfirmation product purchases made by TMI. *Id.*

On these matters, the Motion for Summary Judgment filed by WPSC applies globally: to the substantive allegations of TMI's complaint, to WPSC's affirmative defenses thereto, and to WPSC's counterclaim against the TMI. (Doc. No. 50). On

1. This action was originally commenced on April 28, 2004, in the United States District Court, Eastern District of Michigan, Southern Division. (Case No. 04–71606). Pursuant to an order entered by the Honorable George Steeh, District Judge, the case was transferred to the Northern District of Ohio, "with the recommendation that the action be referred to the bankruptcy court for that district." (Doc. No. 23). In accordance therewith, the Honorable James Carr, Chief District Judge for the Northern District of Ohio, ordered that the matter be heard before the Honorable Kay Woods, Bankruptcy Judge. (Doc. No. 31). But thereafter, for purposes of "judicial economy," this matter was transferred to this Court by the Honorable Randolph Baxter, Chief Bankruptcy Judge, Northern District of Ohio. (Doc. No. 36).

2. WPSC also raised the affirmative defense of setoff and unconscionability. These defenses, however, were later withdrawn. (Doc. No. 55). It is also noted that, as an affirmative defense, WPSC raised issues related to contract formation; but the Court agrees with TMI that such defenses are better viewed as questions of fact related to its breach of contract action. (Doc. No. 53, at pg. 2).

the other hand, the Partial Motion for Summary Judgment filed by TMI applies solely to the affirmative defenses raised by WPSC in its Answer. (Doc. No. 53). Furthermore, as to WPSC's motion for summary judgment on its counterclaim, TMI has since conceded to its liability on the claim, stating in its memorandum before the Court that it "has no objection." (Doc. No. 56, fn. 1).

To prevail on a motion for summary judgment, it is required that "[t]he pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). With respect to this standard, the movant must demonstrate all the elements of his cause of action. *R.E. Cruise Inc. v. Bruggeman,* 508 F.2d 415, 416 (6th Cir.1975). To determine whether this standard has been met, the Court is directed to view all of the facts in a light most favorable to the party opposing the motion. *Matsushita v. Zenith Radio Corp.,* 475 U.S. 574, 586–588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In addition, in cases such as this where the Parties have filed Cross Motions for Summary Judgment, the Court must consider each motion separately since each party, as a movant for summary judgment, bears the burden of establishing the nonexistence of genuine issues of material fact, and that party's entitlement to judgment as a matter of law. *French v. Bank One, Lima N.A. (In re Rehab Project, Inc.),* 238 B.R. 363, 369 (Bankr.N.D.Ohio 1999).

Upon application of this standard of review, it is this Court's legal conclusion that judgment must be rendered in favor of WPSC. As will now be explained, the basis for this conclusion centers on the applicability of the third affirmative defense raised by WPSC: the termination of its fixed offer as provided in the October quote to TMI.

## LAW

In this matter, the lynchpin of TMI's complaint, for breach of contract and then promissory estoppel, stems from this one allegation: that WPSC wrongly failed to honor its promise, as set forth in its October–2001 quote (hereinafter referred to as the "October quote"), to sell its product at a set price for a period of six months. TMI's other claims, such as its position that it is the holder of an administrative claim, are directly dependent on the validity of this position. As such, resolution of the dispute between the Parties must necessarily begin by looking to the Parties' respective contractual rights and obligations under the October quote. But before addressing the substantive issues relating thereto, one preliminary issue needs to be addressed.

In its arguments to the Court, TMI raised an issue as to which state's law applies to the Parties' transaction: Ohio, Michigan or Pennsylvania, with TMI taking the position that Michigan law is applicable. (Doc. No. 53). However, under the facts as they exist here, a determination of this issue is not necessary. It is self-evident that the products sold by WPSC—rolled steel products and the like—are "goods" as defined in Article 2 of the Uniform Commercial Code ("UCC"), with Ohio, Michigan and Pennsylvania each having adopted the provisions of this statutory scheme without change.[3] Further-

---

**3.** O.R.C. § 1302.01, et seq; M.C.L.A. § 440.2101, et seq; 13 Pa.C.S.A. § 2101, et

seq. Goods are defined in Article 2 as "all things (including specially manufactured

more, as to the UCC and to the extent that non-UCC law is applicable, the Court has not been alerted to, and is not aware of any substantive variation in these jurisdictions as to the applicable legal principles that are discussed herein. Accordingly, regardless of which state's law is applied, this Court's interpretation, and hence result, would be the same.

## DISCUSSION

The Parties' dispute in this matter centers on whether the October quote offered by WPSC to TMI can serve as the basis of a legally binding contract. It is axiomatic that the creation of a contract requires the existence of three elements: offer, acceptance and consideration. *Mich. Paytel Joint Venture v. City of Detroit,* 287 F.3d 527, 539 (6th Cir.2002). The arguments presented by WPSC call into question each of these essential elements.

■ An offer is the manifestation of a willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it. *Eerdmans v. Maki,* 226 Mich.App. 360, 364–365, 573 N.W.2d 329 (1997). Completing the picture, acceptance is then the manifestation of assent to the terms of the offer. *Hunter Square v. Paragon,* 2003 WL 21186651 *4 (Mich.App.2003). When these two contractual prerequisites are in place, there is said to be a meeting of the minds, that is, the parties have an agreement.

Excluding momentarily the October quote, the process by which the Parties entered into a contractual relationship in this matter involved this progression of events: upon a request by TMI, WPSC would issue a quote; and thereafter, if

TMI found the quote acceptable, a purchase order would be issued thereon, with WPSC thereafter supplying its product. With the October quote, this same sequence of events, without the goods being shipped, is relied upon to establish the existence of an enforceable contract.

When a quote is issued for the sale of goods, it is the general rule that the initial quote is viewed as an invitation to an offer, not an actual offer, with the purchase order constituting the first document having the legal attributes of an offer. *Audio Visual Assocs. v. Sharp Electronics Corp.,* 210 F.3d 254, 259 (4th Cir.2000). UCC § 2–206(1) serves to complement this rule by allowing for acceptance by either the prompt promise or prompt shipment of the goods. But when applied in this matter, an inconsistency arises.

Excluding again the October quote, those other transactions conducted by the Parties nicely fit the mold just outlined. Upon request by TMI, WPSC would issue a quote thereby providing an invitation for an offer. Thereafter, if it found the quote acceptable, the offer would occur through TMI issuing a purchase order on the quote. Finally, acceptance, as provided in § 2–206, would take place when WPSC supplied the product.

On the other hand, with respect to the October quote, the acts constituting offer and acceptance do not fit the mold, being juxtaposed. Necessarily for a contract to exist, the October quote must be viewed not as an invitation for an offer, but as the offer, with the communications made by TMI the following year, including its purchase order, constituting the purported acceptance thereof. It could not be otherwise. If TMI's purchase order were to constitute the initial offer, then no contract

goods) which are movable at the time of identification to the contract for sale ...." § 2–

105(1).

could possibly exist; the very essence of the Parties' dispute arises from WPSC's refusal to honor TMI's purchase order, undoubtedly an act by WPSC which does not exhibit a manifestation of assent to the terms of the order, thereby negating the necessary element of acceptance.

Resultantly, TMI's position, that the October quote gave rise to a contractual obligation on the part of WPSC, starts on shaky grounds as unlike their other transactions, it does not fit the traditional offer-acceptance mold when a quote is issued for the sale of goods. But even assuming that the October quote constituted a valid offer capable of being accepted, an even more fundamental deficiency exists: the termination of WPSC's offer before its acceptance.

■ Unless otherwise specified, an offer is of indefinite duration, limited only by its reasonableness. 17A Am. Jur. 2D Contracts § 58. Yet while pending, an offer may—subjected to limited exceptions, *discussed infra*—be terminated at any time by either party. In legal parlance, the offeror revokes the offer while the offeree rejects it. 1 Williston on Contracts § 5:2 (4th ed.2006).

■ But whether revocation or rejection, the termination of an offer is accomplished by one party communicating to the other, through words or acts, an unwillingness to enter into the bargain. *Id.*, at §§ 5:2; 5:8. Generally, this occurs by a party undertaking an act inconsistent with the offer, the classic example being a counteroffer.

When viewed in this light, what is most noticeable is TMI informing WPSC that its October quote was not competitive, thereafter requesting and then accepting new price quotes offered by WPSC. Common sense dictates that such acts on the part of TMI should be viewed as introducing a new term to the original offer, thereby constituting a counteroffer, and thus a rejection of the original offer. To hold otherwise begs the question: Why would a party be willing to keep a quote open, thereby exposing themselves to risk, when afterward they are issuing new quotes at lower prices?

The whole point of offering a fixed price is to spread risk; the purchaser agrees to pay a higher price and in return for this consideration, the seller assumes the risk of a subsequent increase in its costs. TMI, however, seeks to have it both ways—by having the benefit, if commodity prices should increase, of the price fixed in the October quote, while foregoing any present obligation, when prices are lower, to make a purchase under the fixed price quote. A close analogy on this point is a mortgage.

■ Commonly when entering into a mortgage contract, a purchaser is offered a lower but variable rate of interest, or they can instead take a higher fixed rate of interest. Yet either way, it is simply understood that once the purchaser makes their choice, the other option is rejected, notwithstanding that the mortgage offer contained any wording to the effect that the interest rate quoted therein would stay open for a longer period of time. The Court can see very little difference here. Once TMI chose to accept those lower-rate quotes offered subsequent to the October quote, it rejected the October quote.

Other points then go on to reinforce the termination of the October quote. First, the evidence before the Court shows that it was not generally WPSC's practice to keep two or more quotes in effect at the same time. (Doc. No. 52, at pg. 4). Similarly, it was not the Parties' practice to enter into long-term quotes. *Id.*, at pgs. 3–5. Also telling are TMI's actions, or perhaps better termed, inactions.

It is the position of TMI that the October quote was critical to their business operations. In their own words, "when WPSC failed to honor a long-term quote for hot and cold rolled steel[,] WPSC's actions caused [TMI] to incur substantial damages and eventually go out of business." But after WPSC issued the October quote, and despite new quotes and new orders being issued, no discussions regarding the October quote took place until the following March. In turn, this begs the question as to why, after telling of the uncompetiveness of the October quote and then requesting new quotes, did not TMI at least contact WPSC to seek further assurances as to the October quote's continued viability? Given the importance TMI now claims it attached to the October quote, their silence regarding the quote for approximately five months is deafening.

TMI, however, argues that regardless of their actions, WPSC's October quote could not have terminated because its own terms provided otherwise—that it was to be valid and kept open for a period of six months, until April 2002. (Doc. No. 56, at pg. 13). At common law, a promise to keep an offer open is known as an option contract. The UCC provides for a partial codification of this principle in § 2–205, entitled "Firm Offers," by providing, in relevant part:

> An offer by a merchant to buy or sell goods in a signed writing which by its terms gives assurance that it will be held open is not revocable, for lack of consideration, during the time stated or if no time is stated for a reasonable time, but in no event may such period of irrevocability exceed three months[.]

The § 2–205 firm offer, however, differs from the common law in an important respect: it does not require that the offeree provide any consideration to make the promise enforceable. The intent of this was to limit the power of an offeror to withdraw a firm offer when the offeree reasonably relies on the offer's firmness.

At the same time, § 2–205 sets forth temporal limitations on its duration; notably, providing that, regardless of any agreement of the parties to the contrary, in no event may the "period of irrevocability exceed three months[.]" And under any method of computation, the offer made by WPSC exceeds this three-month window; WPSC faxed its quote to TMI on October 11, but no response was forthcoming until the following March, approximately five months later.

This, however, only represents one side of the coin because while the UCC is applicable to the Parties' transaction, the § 2–205 firm offer does not displace the common law option contract. UCC § 1–103 provides that, unless otherwise displaced by particular provisions of the UCC, "the principals of law and equity, ... shall supplement their provisions." In this way, § 2–205 gives no indication that, when a party promises to keep a quote open, common law principles would not supplement rather than displace the contractual obligations of the parties. In *Bethlehem Steel Corp. v. Litton Indus., Inc.*, a case on point, the court explained, the UCC "discloses no legislative intent to eliminate the option contract, with its requirement of consideration. Hence, the necessary distinction between the 'option' which is in reality a firm offer and the option contract." *Bethlehem Steel Corp. v. Litton Indus., Inc.*, 507 Pa. 88, 125, 488 A.2d 581, 600 (1985).

Unlike a UCC § 2–205 firm offer, an option contract is not limited in its duration; to the contrary, unless nullified by other contractual principles, an option contract will last according to its terms. But as alluded too earlier, a non-UCC option contract requires the existence of consideration. This is because the option

contract is, for all practicable purposes, a separate contract,—a contract whereby, in return for consideration given, a promisor agrees to be limited in his power to revoke an offer, normally by a prescribed period of time. *See* 17A AM. JUR. 2D Contracts § 53 (2006). It is the position of WPSC that this necessary element, consideration, is lacking. (Doc. No. 52, at pg. 12).

■ Consideration, as that is necessary to form a contract, is given when a person does anything legal that he or she is not bound to do, or refrains from doing anything that he or she has a right to do. *TMA Fund, Inc. v. Biever*, 380 F.Supp. 1248, 1253 (E.D.Pa.1974). Consideration must also be mutual, that is it must flow from both the offeror and offeree to the other. 17A AM. JUR. 2D Contracts § 129 (2006). Against this requirement of mutuality, WPSC argues that the consideration TMI gave in return for its 6–month quote was illusory as it "contains no actual obligation by [TMI] to do anything." (Doc. No. 52, at pg. 14). Against this, TMI argues that its promise to WPSC was not illusory because in "exchange for the Quote, Triad agreed to give WPSC the right to a last bid on any orders for the duration of the Quote." (Doc. No. 56, at pg. 13).

■ As put forth by WPSC, the existence of an illusory promise prevents the formation of a contract for want of mutual consideration. An illusory promise is one which, according to its own terms, makes the promisor's performance optional. *Roth Steel Products v. Sharon Steel Corp.*, 705 F.2d 134, 144–45, fn. 22 (6th Cir.1983). Another way of looking at it: with an illusory promise no consideration is given as, with performance being optional, the promisor "has it within his power to keep his promise and yet escape performance of anything detrimental to himself or beneficial to the promisee." 3 Williston on Con-

tracts, § 7:7 (4th ed.). Indicative of an illusory promise is the type of situation presented here, where the buyer has not committed itself to any specified quantity for purchase.

■ A contract must be definite and certain as to the quantity of the goods sold. *See* U.C.C. § 2–201 (contract is not enforceable beyond the quantity of goods shown in writing); *Ace Concrete Products Co. v. Charles J. Rogers Construction Co.*, 69 Mich.App. 610, 245 N.W.2d 353 (1976) (parol evidence could not be offered to supply a missing quantity term; it must appear in the writing). While this does not mean that an exact quantity must be specified, the quantity must be capable of being determined with reasonable certainty. *See, e.g., Duffy v. Duffy*, 881 A.2d 630, 634 (D.C.2005). In looking to whether a quantity can be determined with reasonable certainty, it is helpful to look at two similar types of agreements, involving the sale of goods, which straddle the wall between an enforceable and unenforceable contract: an indefinite quantities contract and a requirements contract.

An indefinite quantities contract is an agreement under which the buyer agrees to purchase and the seller agrees to supply whatever quantity of goods the buyer chooses to purchase from the seller. *Gull Laboratories, Inc. v. Diagnostic Technology, Inc.*, 695 F.Supp. 1151, 1153 (D.Utah 1988). A requirements contract, on the other hand, is one in which the purchaser agrees to buy all of its needs of a specified material from a particular supplier, and the supplier agrees, in turn, to fill all of the purchaser's needs during the period of the contract. *Mason v. United States*, 222 Ct.Cl. 436, 615 F.2d 1343, 1346 (1980), *cert. denied*, 449 U.S. 830, 101 S.Ct. 98, 66 L.Ed.2d 35. While each of these agreements lack a specified quantity, there exists this key difference:

■ Under a requirements contract, by the buyer agreeing to turn to the seller for its purchase requirements, a legal duty arises upon the buyer to make such purchases in good faith, contingent only upon its actual needs. *Accord General Motors Corp. v. Paramount Metal Products Co.,* 90 F.Supp.2d 861 (E.D.Mich.2000). By contrast, with an indefinite quantities contract, even if the buyer needs the commodity in question, he is not obligated to purchase it from the seller. *Torncello v. United States,* 231 Ct.Cl. 20, 681 F.2d 756, (1982). Resultantly, with an indefinite quantities contract, at least in the absence of a guaranteed minimum purchase, the buyer's promise is deemed illusory and unenforceable. *See, e.g., Ind.-Am. Water Co., Inc. v. Town of Seelyville,* 698 N.E.2d 1255, 1259–60 (Ind.Ct.App.1998). To this end, the UCC recognizes the validity of the requirements contract, § 2–306, but not the indefinite quantities contract.

Viewed from this perspective, the October quote given to TMI by WPSC is significantly more akin to that of an indefinite quantities contract. The material requirements of TMI were never made a part of the October quote; nor did the agreement contain any sort of minimum purchase requirement. Instead, as properly pointed out by WPSC, under its quote, TMI "could buy steel or not, could present other suppliers' prices to Wheeling–Pitt or not, and could purchase the same steel at other prices or not." (Doc. No. 52, at pg. 14). The fact that TMI agreed to give WPSC the right to a last bid, does nothing to change this; it in no way obligated TMI to make a purchase, even a minimum one, had WPSC submitted the lowest bid. *Accord MM Global Services Inc. v. Dow Chemical Co.,* 283 F.Supp.2d 689, 700 (D.Conn.2003) (it is generally accepted that agreements that impose no specific purchase obligation are not enforceable).

In short then, had TMI decided not to accept WPSC's October price quote, it would not have suffered even an iota of legal detriment. This point was acknowledged by TMI, when its principal testified at a deposition as follows:

Question: So is it your testimony that [the October quote] was a quote that was to be left open while [TMI] purchased steel at lower prices throughout the entire period?

Answer: If it was available to us. We gave them the opportunity to meet the lowest price in the marketplace if—that was their choice. We gave them the opportunity for last look as you would call it.

Question: But at the same time, [TMI] believed that it could still at any time from November to April, 02, order steel at prices set forth in the October quote, correct?

Answer: Yes

Question: Even though it was ordering steel from [WPSC] under new quotes for the same steel during the same periods?

Answer: We could have ordered that from other mills as well. That was made available to us.

(Dep. Tr., John M. Telepo, dated March 10, 2006).

Resultantly, given the weight of these considerations, WPSC's promise to keep its offer open for six months was not binding. There is simply no convincing evidence that TMI provided WPSC with consideration to keep the October quote open; it could, at its sole option and for absolutely no reason, decline to place an order on WPSC's quote without suffering any legal consequence. Consequently, when all things are then considered, WPSC's October quote cannot form the foundation of a legally binding contract. As first explained in this Court's analysis, it is questionable whether the October quote even

constituted an offer. But, even if it did, the circumstances in this case show that the offer terminated prior to TMI's purported acceptance, approximately five months later. These same circumstances then show that, whether under the UCC or the common law, TMI gave no consideration to WPSC to keep the quote open.

■ In the absence of a contractual agreement, TMI also seeks to recover under the doctrine of promissory estoppel. This doctrine may be defined, according to its elements, as (1) a promise, (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee, (3) which in fact produced reliance or forbearance of that nature, and (4) in circumstances such that the promise must be enforced if injustice is to be avoided. *Schmidt v. Bretzlaff,* 208 Mich.App. 376, 378–379, 528 N.W.2d 760 (1995). Like with the option contract, the UCC does not displace a party's right to seek recovery under this doctrine, except possibly where the UCC's statute of frauds is applicable. *See Green Leaf Nursery, Inc. v. Kmart Corp.,* Slip Copy, 2006 WL 482555 (E.D.Mich.2006).

■ The function of the promissory estoppel doctrine is to promote equity by preventing a party from asserting rights under a rule of law when the party's own conduct renders the assertion of such rights contrary to equity and good conscience. Thus, it can serve as a substitute for consideration in contract formation, including an option contract. *See, e.g., Strata Prod. Co. v. Mercury Exploration Co.,* 121 N.M. 622, 628, 916 P.2d 822, 828 (1996). But the doctrine is to be applied cautiously. *Delaware River Port Auth. v. Thornburgh,* 137 Pa.Cmwlth. 7, 18, 585 A.2d 1123, 1128 (1989). And when placed in this context, the circumstances in this matter do not rise to the level to justify applying the doctrine.

■ Central to the concept of promissory estoppel, is a party's detrimental reliance. *Accord* 4 Williston on Contracts §§ 8:4, 8:5 & 8:6 (4th ed.). In this matter, TMI claims such reliance because it "relied on its contract with WPSC and ... entered into long term contracts with certain of its customers." (Doc. No. 1, at pg. 4). But even if true, TMI's reliance was not reasonably warranted. As already explained in detail, when discussing TMI's rejection of the October quote, logic holds that when a lower price quote is accepted over a higher fixed price quote, the latter is rejected. Additionally, even if this were not the case, the necessary element of WPSC's inducement is lacking as TMI made sales promises based on the October quote on its own accord, not at the urging of WPSC.

Simple equity also does not call for the application of the promissory estoppel doctrine. To begin with, TMI has withheld payment to WPSC on a liquidated debt, in the hopes that it would be able to offset such an amount on its disputed claim in this matter. But more important, the Court is troubled by the time line in this matter. Specifically, TMI submitting its purchase order on the October quote just days before the time stated therein was to expire, and then requesting in the order, an amount of steel which appears out of alignment, to the higher, with its past order. Simply put, it appears that TMI was attempting to buy a lawsuit from a financially troubled company, hardly a laudable goal.

In summation, whether for breach of contract or on the basis of promissory estoppel, the Court cannot find that TMI is entitled to recover damages for WPSC not honoring the price as contained in its quote issued in October of 2001. In reach-

ing the conclusion found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Opinion.

Accordingly, it is

**ORDERED** that the Partial Motion for Summary Judgment filed by the Plaintiff, Triad Metals, Inc., be, and is hereby, DE-NIED.

It is **FURTHER ORDERED** that the Motion for Summary Judgment filed by the Defendant and Counterclaimant, Wheeling–Pittsburgh Steel Corp., be, and is hereby, GRANTED; and that the Plaintiff's Complaint is accordingly DIS-MISSED.

It is **FURTHER ORDERED** that the Defendant, Wheeling–Pittsburgh Steel Corp., is hereby Granted Judgment on its Counterclaim in the amount of $654,280.03, plus interest from December 26, 2003. The Clerk, United States Bankruptcy Court, is directed to issue a certificate of judgment reflecting this Order.